**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO,
EASTERN DIVISION**

| | | |
|---|---|---|
| ALISON KAREEM, | : | |
| | : | |
| *Plaintiff*, | : | Case No. 1:20-cv-2457 |
| | : | |
| v. | : | JUDGE DAVID A. RUIZ |
| | : | |
| CUYAHOGA COUNTY BOARD OF | : | |
| ELECTIONS, et al., | : | |
| | : | |
| *Defendants*. | : | |

---

### OHIO SECRETARY OF STATE'S MOTION FOR SUMMARY JUDGMENT

---

Now comes Defendant Ohio Secretary of State Frank LaRose ("Defendant") and hereby moves this Court to grant summary judgment to Defendant pursuant to Federal Rule of Civil Procedure 56. The reasons for this motion are set forth in the attached memorandum.

Respectfully submitted,

DAVE YOST
Ohio Attorney General

*/s/ Ann Yackshaw*
ANN YACKSHAW (0090623)
JULIE M. PFEIFFER (0069762)*
  *Counsel of Record*
ANDREW D. MCCARTNEY (0099853)
Assistant Attorneys General
Constitutional Offices Section
30 East Broad Street, 16th Floor
Columbus, Ohio 43215
Tel: 614-466-2872 | Fax: 614-728-7592
Julie.Pfeiffer@OhioAGO.gov
Ann.Yackshaw@OhioAGO.gov
Andrew.McCartney@OhioAGO.gov

*Counsel for Defendant*
*Ohio Secretary of State Frank LaRose*

# **TABLE OF CONTENTS**

Table of Authorities ....................................................................................................... iii

Memorandum In Support ................................................................................................ 1

Issues To Be Decided ..................................................................................................... 1

Introduction .................................................................................................................... 2

Summary of the Argument ............................................................................................. 3

Statement of Facts .......................................................................................................... 4

Standard of Review ........................................................................................................ 7

Argument ........................................................................................................................ 7

    I.     This Court Lacks Subject-Matter Jurisdiction Because Ms. Kareem Lacks Standing. ................................................................................................ 7

          A.     Ms. Kareem lacks standing because she has no concrete injury. ......................................................................................... 8

          B.     Separately and independently, Ms. Kareem lacks standing because she has not established that she intends to engage in conduct the ballot-exposure statutes prohibit. ......................... 11

          C.     Separately and independently, Ms. Kareem lacks standing because any subjective chill is not "fairly traceable" to the actions of the Secretary of State ........................................... 12

          D.     For similar reasons, this case is not ripe for adjudication. ....................... 13

    II.    Regardless, the Court Should Grant Summary Judgment on Ms. Kareem's First Amendment Claim. ................................................................ 13

          A.     Ohio's ballot-exposure statutes are content neutral because their application does not depend upon the message conveyed. ...................................................................................... 14

          B.     The ballot-exposure statutes satisfy constitutional scrutiny because they prohibit conduct that leads to election corruption. .............................................................................. 18

                1.    Ohio has interests in corruption-free elections. ........................... 19

                2.    Ohio's ballot-exposure ban is sufficiently tailored. ..................... 25

          C.     The ballot-exposure statutes are not unconstitutionally broad. ................................................................................... 29

Conclusion .................................................................................................................... 31

Certificate of Service ................................................................................................... 33

Certificate of Compliance ............................................................................................ 33

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                              **Page(s)**

*Anderson v. Kent State Univ.*,
   804 F. Supp. 2d 575 (N.D. Ohio 2011)...............................................................................7

*Birmingham v. Nessel*,
   No. 21-1297, 2021 U.S. App. LEXIS 35896 (6th Cir. Dec. 2, 2021).....................8, 10, 11, 12

*Broadrick v. Oklahoma*,
   413 U.S. 601 (1973)...............................................................................................................29

*Burdick v. Takushi*,
   504 U.S. 428 (1992).........................................................................................................26, 30

*Burson v. Freeman*,
   504 U.S. 191 (1992) (plurality opinion) ....................................................................... *passim*

*Carey v. Wolnitzek*,
   614 F.3d 189 (6th Cir. 2010) ...............................................................................................29

*Crookston v. Johnson*,
   841 F.3d 396 (6th Cir. 2016) .......................................................................................... *passim*

*Déjà Vu of Nashville, Inc., v. Metro. Gov't of Nashville & Davidson Cty.*,
   274 F.3d 377 (6th Cir. 2001) ...............................................................................................29

*Fieger v. Mich. Supreme Court*,
   553 F.3d 955 (6th Cir. 2009) ..........................................................................................8, 12

*Hill v. Homeward Residential, Inc.*,
   799 F.3d 544 (6th Cir. 2015) ...............................................................................................18

*Hill v. Williams*,
   Nos. 16-cv-2627, 16-cv-2649, 2016 U.S. Dist. LEXIS 155460 (D. Colo. Nov.
   4, 2016) .................................................................................................................................17

*Indiana Civ. Liberties Union Found., Inc. v. Indiana Secy. of State*,
   No. 1:15-cv-1356-SEB-DML, 2015 U.S. Dist. LEXIS 182116 (S.D. Ind. Oct.
   19, 2015) ...............................................................................................................................17

*L.D. Mgmt. Co. v. Gray*,
   988 F.3d 836 (6th Cir. 2021) ...............................................................................................15

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992)...............................................................................................7, 8, 12, 13

**Cases**                                                                    **Page(s)**

*Morrison v. Bd. of Edn.*,
    521 F.3d 602 (6th Cir. 2008) ........................................................8, 9, 11

*NRA of Am. v. Magaw*,
    132 F.3d 272 (6th Cir. 1997) ........................................................10, 11

*Project Veritas v. Ohio Elec. Comm.*,
    418 F. Supp. 3d 232 (S.D. Ohio 2019) ...............................14, 15, 16, 19

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015)..........................................................................15

*Rideout v. Gardner*,
    123 F. Supp. 3d 218 (D.N.H. 2015)....................................................17

*Sensations, Inc. v. City of Grand Rapids*,
    526 F.3d 291 (6th Cir. 2008) ............................................................29

*Silberberg v. Bd. of Elections of N.Y.*,
    272 F. Supp. 3d 454 (S.D.N.Y. 2017)........................................ *passim*

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014)....................................................................13, 16

*Susan B. Anthony List v. Driehaus*,
    814 F.3d 466 (6th Cir. 2016) ............................................................16

*Timmons v. Twin Cities Area New Party*,
    520 U.S. 351 (1997)...............................................................25, 26, 30

*Virginia v. Black*,
    538 U.S. 343 (2003)..........................................................................14

*Wesberry v. Sander*s,
    376 U.S. 1 (1964).............................................................................19

**Statutes**                                                                 **Page(s)**

1891 Ohio Laws 449, § 14......................................................................21

1891 Ohio Laws 499, § 15......................................................................21

1891 Ohio Laws 499, § 21......................................................................21

Ohio Rev. Code § 3501.35(A)(4) ......................................................6, 29

Ohio Rev. Code §§ 3501.35(A)(4) and 3599.20..............................3, 4, 6, 18

**Statutes**                                                                                                   **Page(s)**

Ohio Rev. Code § 3509.02(A) ...........................................................................................23

Ohio Rev. Code § 3599.20 ..........................................................................................6, 29

Ohio Rev. Code § 3599.40 ..............................................................................................6

**Other Authorities**                                                                                          **Page(s)**

U.S. Const. amend. I ............................................................................................. *passim*

U.S. Const. amend. XIV ..................................................................................................6

## MEMORANDUM IN SUPPORT

### ISSUES TO BE DECIDED

1.    Whether Plaintiff lacks standing where she has never been prosecuted under the challenged ballot-exposure statutes, has never been warned or threatened with prosecution by a government official for posting or attempting to post a ballot selfie, and has no concrete plans to post a ballot selfie in the future.

2.    Whether Ohio violates Plaintiff's First Amendment rights by prohibiting her and other Ohio voters from exhibiting or displaying a ballot when such behavior historically led to widespread election corruption and fraud in this State.

3.    Whether it is unconstitutionally overbroad for a ban on exhibiting or displaying ballots to also prohibit ballot selfies.

## INTRODUCTION

"These people down here, many of them, do not realize that they are doing wrong when they sell their votes.  It is a custom.  They won't go to the polls unless they are paid."  *A County Where Selling Votes Is Universal*, N.Y. Times, Jan. 15, 1911, attached hereto as Exhibit A.  Thus, a national newspaper once described voting in Adams County, Ohio.

Ohio has not always enjoyed clean elections.  Major political, cultural, and legal shifts in the late nineteenth century transformed Ohio's elections, once rife with vote buying and selling, into the orderly process now in place.  Chief among these shifts was the introduction of the secret ballot.  Before the secret ballot, vote buyers could hand a ballot to a voter, watch the voter place the ballot in the ballot box, and reward the voter with whatever price the parties agreed upon.  Vote confirmation was the engine that made these schemes run.  A vote buyer was willing to part with $1 or a bottle of whiskey because he could *confirm* that the voter cast the ballot he paid for.  But when Ohio introduced the secret ballot, private polling places, and other electoral reforms, the vote buyer could no longer confirm that votes he paid for equaled the votes cast.  The secret ballot and other Progressive Era election reforms turned elections from public, sometimes violent, spectacles into the honest civic exercises we know today.

Secret ballots and private polling places have lasted more than 100 years undisturbed.  Now, Plaintiff Alison Kareem wants to jettison the protections of the secret ballot for herself and all other Ohioans in the name of ballot selfies.  That is, Plaintiff asks this Court to invalidate a cornerstone of Ohio's election-security structure so that she may post photographs on her Facebook page.  Plaintiff lacks standing to challenge these statutes.  Regardless, the Court should decline her invitation to publicize ballots.  The Court should preserve the privacy of the polls and the security of Ohio's elections by granting Defendant's motion for summary judgment.

## SUMMARY OF THE ARGUMENT

Defendant Secretary of State Frank LaRose's motion for summary judgment should be granted for two independent reasons.  First, this Court lacks subject-matter jurisdiction because Ms. Kareem lacks standing and her case is not ripe.  But even if this Court finds that Ms. Kareem adequately established standing to sue, her First Amendment claim fails as a matter of law.  Ohio Revised Code §§ 3501.35(A)(4) and 3599.20 ("the ballot-exposure statutes" or "the ballot-exposure ban") withstand constitutional scrutiny as content-neutral laws sufficiently tailored to advance the State's interests in them.

To begin, Ms. Kareem has no concrete injury and thus cannot satisfy the first required element of Article III standing.  Ms. Kareem has never been prosecuted under either ballot-exposure statute, nor has she been warned or threatened with prosecution by any government official.  Ms. Kareem alleges that she feels threatened by the existence of the statutes themselves— but under Sixth Circuit precedent, that is insufficient to establish an injury-in-fact.  Moreover, to have an injury-in-fact, Ms. Kareem would need not only a credible threat of prosecution but also a definite intent to engage in conduct that the ballot-exposure statutes prohibit.  But Ms. Kareem has testified that she has no concrete plans for posting a ballot selfie.

In addition, Ms. Kareem cannot establish the second, causation element of standing.  Ms. Kareem is complaining not about any action taken by the Ohio Secretary of State or another government official, but rather about the fact that Ohio's ballot-exposure statutes are on the books.  This inability to link any action of the Secretary of State to the harm she alleges is a separate, additional reason why she lacks standing.  For these reasons, the Court lacks jurisdiction over her lawsuit.

But even if Ms. Kareem had standing, her First Amendment challenge to the ballot-exposure statutes would still fail as a matter of law.  Ohio's ballot-exposure statutes prohibit voters

from exhibiting or displaying ballots they intend to cast.  Ohio Rev. Code §§ 3501.35(A)(4), 3599.20.  Because neither law's application depends upon the message or statement the voter conveys by exhibiting or displaying the ballot, each law is content neutral, and intermediate scrutiny applies.  Under that standard, a law stands so long as it restricts First Amendment freedoms no more than necessary to further substantial state interests.  On the interests side, the State's interests in maintaining elections free of vote buying, selling, coercion, and intimidation could hardly be more substantial.  On the First Amendment restrictions side, meanwhile, Ms. Kareem's interests are quite slight.  Ms. Kareem seeks to coopt a ballot for individual speech, a right that the Supreme Court has not historically recognized. And on the tailoring side, ample evidence shows that *any* opportunity for vote confirmation through ballot exposure will be exploited by fraudsters.  Accordingly, by prohibiting all ballot exposures, the State sufficiently tailored the statutes to its interests.

Plaintiff's overbreadth challenge fails as a matter of law for similar reasons.  An overbreadth challenge requires a showing that a substantial number of a law's applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.  Again, because *any* ballot exposure leads to vote confirmation, which underlies the election-corruption schemes the State seeks to prohibit, it is not overly broad to prohibit *all* ballot exposures.

For these reasons and as more fully explained below, Secretary LaRose asks that this Court grant his motion for summary judgment.

### STATEMENT OF FACTS

According to Ms. Kareem's sworn deposition testimony, six or seven years ago (in 2015 or 2016), she voted on a statewide ballot initiative regarding medical marijuana.  Kareem Dep. at 47:15-25; 53:2-4, attached hereto as Exhibit B.  She recalls photographing a portion of her ballot

and posting it on her Facebook account (an account she indicated was probably not public at the time).  *Id.* at 59:2-11.

Sometime after posting this ballot selfie, Ms. Kareem recalls seeing somewhere on the internet something about how under Ohio law, posting a ballot selfie is a felony.  Ex. B, Kareem Dep. at 50:24-51:3; 51:17-19.  Ms. Kareem could not recall whether this information came from a comment to the ballot selfie that she posted on Facebook, or whether she read the information elsewhere on the internet unrelated to her own ballot selfie.  *See id.* at 50:24-51:3 ("I don't remember if it was a direct response to my post or [if] it was something on social media at the time.  I just remember that I had that post, and at some point I read on social media about it being a felony . . . ."); *see also id.* at 21:18-23.  Ms. Kareem acknowledged that the source of the information "could . . . have been a news article."  *Id.* at 51:17-19.  She does not recall the author of the information.  *Id.* at 47:7.

Ms. Kareem then Googled the ballot-selfie issue to confirm the information she had read, and subsequently removed her ballot selfie from her Facebook account.  Ex. B, Kareem Dep. at 21:18-20; 51:1-3.  To the best of her knowledge, this was the only time she posted on social media a photograph of a voted ballot (or part of a voted ballot) of any kind.  *Id.* at 50:7-11.

In the 2020 general election, Ms. Kareem voted early in person with her brother at the Cuyahoga County Board of Elections.  Ex. B, Kareem Dep. at 34:19-23; *id.* at 70:6-9.  She took a selfie, and then her brother photographed her with her voted ballot.  *Id.* at 70:15-71:1; *see also id.* at 40:1-7.  However, Ms. Kareem stated that she did not post this ballot selfie on the internet.  *Id.* at 40:14-19.

Ms. Kareem testified that no government entity has contacted her with respect to ballot selfies generally or her own ballot selfie.  Ex. B., Kareem Dep. at 72:23-73:5, 17-20.  Moreover,

Ms. Kareem testified that she was not aware of anyone in Ohio being prosecuted for posting a ballot selfie on social media. *Id.* at 63:2-6. In addition, Ms. Kareem has received no warning letter, cease-and-desist letter, or any other communication from a government official concerning ballot selfies. *Id.* at 52:12-20; 65:11-20; 73:18-20. No government official commented on the ballot selfie she posted on her Facebook account in 2015 or 2016. *Id.* at 57:3-12; 73:1-5, 18-20. At her deposition in this lawsuit, Ms. Kareem testified that she "d[id] not have any concrete specific plans regarding the posting of a ballot or ballot selfie[.]" *Id.* at 66:21-24.

In October 2020, Ms. Kareem filed this § 1983 lawsuit, alleging that Ohio Rev. Code §§ 3501.35(A)(4) and 3599.20 infringe on her free speech rights in violation of the First and Fourteenth Amendments to the United States Constitution. Doc. No. 1. Specifically, Ms. Kareem alleges that the two ballot-exposure statutes violate the First Amendment insofar as they prohibit her from posting a "ballot selfie" on social media. In relevant part, the statutes provide as follows:

> During an election and the counting of ballots, no person shall . . . [e]xhibit any ticket or ballot which the elector intends to cast.

> and

> No person shall attempt to induce an elector to show how the elector marked the elector's ballot at an election; or, being an elector, allow the elector's ballot to be seen by another, except as provided by section 3505.24 of the Revised Code, with the apparent intention of letting it be known how the elector is about to vote.

Ohio Rev. Code §§ 3501.35(A)(4), 3599.20. Violation of Ohio Rev. Code § 3599.20 is a felony of the fifth degree. Revised Code § 3501.35(A)(4) does not set forth its own penalty, and the general penalty for violation of Title 35 is a misdemeanor of the first degree. Ohio Rev. Code § 3599.40.

The Ohio Secretary of State answered Ms. Kareem's Complaint, and the parties commenced discovery. Doc. No. 7. Discovery closed on January 31, 2022. Doc. No. 21. Secretary LaRose now moves for summary judgment.

**STANDARD OF REVIEW**

Summary judgment must be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Anderson v. Kent State Univ.*, 804 F. Supp. 2d 575, 581 (N.D. Ohio 2011) (quoting Fed. R. Civ. P. 56(a)). In reviewing summary-judgment motions, the Court views the evidence in "a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists." *Id.* at 582. "A fact is 'material' only if its resolution will affect the outcome of the lawsuit." *Id.* "Determination of whether a factual issue is 'genuine' requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide whether reasonable jurors could find by a preponderance of the evidence that the non-moving party is entitled to a verdict." *Id.* (internal quotation marks omitted). "Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Id.* "The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established which create a genuine issue of material fact." *Id.*

**ARGUMENT**

**I.** **This Court Lacks Subject-Matter Jurisdiction Because Ms. Kareem Lacks Standing.**

Ms. Kareem cannot meet her burden to establish that she has standing to bring this lawsuit. "The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). A plaintiff invoking jurisdiction must "show[] that [s]he has standing for each type of relief sought." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). Moreover, "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. A plaintiff cannot rely

7

on "mere allegations" with respect to each standing element, "but must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true." *Id.* (internal citation omitted).

### A.    Ms. Kareem lacks standing because she has no concrete injury.

First, Ms. Kareem lacks standing because she lacks a cognizable injury-in-fact.  "That a litigant must establish standing is a fundamental element in determining federal jurisdiction over a 'case' or 'controversy' as set forth in Article III of the Constitution."  *Morrison v. Bd. of Edn.*, 521 F.3d 602, 608 (6th Cir. 2008).  To satisfy the Constitution's standing requirement, a party must establish that:

> (1) he or she has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Fieger v. Mich. Supreme Court*, 553 F.3d 955, 962 (6th Cir. 2009) (citation omitted).  "To meet the injury-in-fact prong based on future harm, a plaintiff must allege 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'"  *Birmingham v. Nessel*, No. 21-1297, 2021 U.S. App. LEXIS 35896, at *3 (6th Cir. Dec. 2, 2021) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014)).

Ms. Kareem cannot show that she has suffered an injury-in-fact that is "concrete and particularized" as well as "actual or imminent."  *See Fieger*, 553 F.3d at 962.  When deposed, Ms. Kareem admitted that she has never been contacted by any government official threatening any adverse action because of her taking or posting a ballot selfie.  *See* Ex. B, Kareem Dep. at 54:21-22; 65:1-2 ("I have not received anything from a government official. . . . I have not been personally threatened by a government entity.").  Her only alleged injury is subjective chill—that

is, refraining from posting a ballot selfie on social media because of alleged fear of government reprisal.  Compl. ¶¶ 37-38, Doc. No. 1 at PageID 9.  Ms. Kareem made clear that "[t]he only threat I have had is through the Ohio Revised Code."  Ex. B, Kareem Dep. at 65:2-3.  When asked whether she had any fear of prosecution for taking a ballot selfie in 2020, Ms. Kareem responded, "Somewhat."  *Id.* at 71:2-4.  However, Ms. Kareem made clear that the only basis for this fear of prosecution is the fact that Ohio's ballot-exposure laws are on the books: "One only needs to have the law on the books, and—and a person only has to believe that they will be prosecuted."  *Id.* at 59:25-60:3.

Ms. Kareem's subjective chill is insufficient for standing.  "With respect to the standing of First Amendment litigants, the Supreme Court is emphatic: 'Allegations of a subjective "chill" are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm.'"  *Morrison*, 521 F.3d at 608 (quoting *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972)).  "In order to have standing, therefore, a litigant alleging chill *must still establish that a concrete harm— i.e., enforcement of a challenged statute—occurred or is imminent*."  *Id.* at 610 (emphasis added).

But Ms. Kareem cannot meet her burden to show that enforcement of Ohio's ballot-exposure laws against her has "occurred or is imminent."  *See id.*  First, Ms. Kareem testified that she has never been prosecuted under either ballot-exposure statute for posting, showing, or attempting to post or show a picture of her voted or completed ballot.  Ex. B, Kareem Dep. at 61:22-62:16; 73:1-5, 18-20.

Second, Ms. Kareem testified that she has never been *threatened* with prosecution under either ballot-exposure statute by any government official.  *See, e.g.*, Ex. B, Kareem Dep. at 63:24-25 ("*I have not been personally threatened with prosecution*." (emphasis added)); *see also id.* at 62:17-63:1-6; 65:1-3; 73:1-5, 18-20.  Moreover, Ms. Kareem is not aware of anyone else in Ohio

being threatened with prosecution or prosecuted for posting a ballot selfie.  *See, e.g.*, *id.* at 63:4-6 (testifying that "[t]he only threat to prosecution I am aware of is the fact that it is a fifth-degree felony in the State of Ohio").  Ms. Kareem's deposition testimony makes clear that her alleged fear of prosecution is based only on the bare existence of the statutes themselves.  *Id.* at 65:2-3 ("The only threat I have had is through the Ohio Revised Code.").

Specifically, Ms. Kareem testified that the Ohio Secretary of State's Office never contacted her regarding a ballot selfie or the posting of her ballot selfie on the internet.  Ex. B, Kareem Dep. at 54:10-11.  Nor did the Cuyahoga County Board of Elections.  *Id.* at 54:15.  Nor did the Cuyahoga County Prosecutor's Office.  *Id.* at 73:1-5.  According to Ms. Kareem, no state government official has ever communicated with her regarding ballot selfies.  *Id.* at 73:18-20 ("I have not seen any type of correspondence or attempt to contact me from a government entity.").  Ms. Kareem has received no warning letters, cease-and-desist letters, mail, email, direct messages, or any other communication regarding her ballot selfies from the Secretary of State's Office, the Board of Elections, or the Prosecutor's Office.  *Id.* at 52:12-20 (no warning or cease-and-desist letters); 65:11-20 (no warning letters); 73:18-20 (no communications from any government official).  None of these state government officials commented on the ballot selfie she posted on her Facebook page.  *Id.* at 57:3-12; 73:1-5, 18-20.

Based on these undisputed facts, Ms. Kareem has no "credible threat of prosecution" and thus no standing to challenge Ohio's ballot-exposure statutes.  *Birmingham*, 2021 U.S. App. LEXIS 35896, at *3 (quoting *Susan B. Anthony List*, 573 U.S. at 159).  Under established Sixth Circuit precedent, the fact that laws are on the books is insufficient to establish standing: "The mere existence of a statute, which may or may not ever be applied to plaintiffs, is not sufficient to create a case or controversy within the meaning of Article III."  *NRA of Am. v. Magaw*, 132 F.3d

272, 293 (6th Cir.1997) (internal quotation marks omitted); *see also id.* at 294 ("[P]laintiffs'
implication that the statute has a 'chilling' effect . . . does not establish standing.  Every criminal
law, by its very existence, may have some chilling effect on personal behavior." (internal quotation
marks omitted)).  Ms. Kareem has no history of prosecution under Ohio's ballot-exposure statutes,
is not aware of anyone being prosecuted under these statutes for posting a ballot selfie, and has
received no warning or threat of prosecution regarding ballot selfies from a government official.
"[F]or purposes of standing, subjective chill requires *some specific action on the part of the
defendant* in order for the litigant to demonstrate an injury-in-fact."  *Morrison*, 521 F.3d at 609
(emphasis added).  "[W]here a First Amendment plaintiff only alleges inhibition of speech, the
federal courts routinely hold that no standing exists."  *Id.* (collecting cases).  Ms. Kareem lacks
any concrete injury and therefore cannot establish standing.

      **B.**      **Separately and independently, Ms. Kareem lacks standing because she has not
established that she intends to engage in conduct the ballot-exposure statutes
prohibit.**

To satisfy the injury-in-fact requirement in this pre-enforcement context, Ms. Kareem must
establish not only that "there exists a credible threat of prosecution" under the challenged ballot-
exposure statutes (which she cannot show), but also that she has "an intention to engage in a course
of conduct arguably affected with a constitutional interest, but proscribed by statute."
*Birmingham*, 2021 U.S. App. LEXIS 35896, at *3 (quoting *Susan B. Anthony List*, 573 U.S. at
159).

But here, Ms. Kareem lacks an intention to engage in conduct proscribed by Ohio's ballot-
exposure statutes.  When asked at her deposition whether she had any plans to post on social media
or show anyone a picture of her voted or completed ballot in an upcoming election, Ms. Kareem
testified: "I might not.  I might.  I don't know.  I don't know what's in my head right now with
what I might do in the future."  Ex. B, Kareem Dep. at 66:5-7.  Ms. Kareem then clarified that she

"d[id] not have any concrete specific plans regarding the posting of a ballot or ballot selfie[.]"  *Id.* at 66:21-24.  Thus, Ms. Kareem has not established that she "intends to engage in any conduct that the law prohibits."  *Birmingham*, 2021 U.S. App. LEXIS 35896, at *4.  Accordingly, and for this additional reason, she "cannot show any injury in fact."  *Id.* (citing *White v. United States*, 601 F.3d 545, 553 (6th Cir. 2010)).

### C. Separately and independently, Ms. Kareem lacks standing because any subjective chill is not "fairly traceable" to the actions of the Secretary of State.

Even assuming for the sake of argument that Ms. Kareem's decision to refrain from posting a ballot selfie is a concrete injury (which it is not), that decision would not be "fairly traceable" to any action of the Secretary of State.  *See Fieger*, 553 F.3d at 962.  In addition to a concrete injury, "there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court."  *Lujan*, 504 U.S. at 560 (internal quotation marks omitted).  Ms. Kareem cannot establish causation.

First, there can be no "causal connection between the injury and the conduct complained of" because Ms. Kareem is not complaining of *conduct* at all.  All she is complaining about is the fact that Ohio's ballot-exposure laws are still on the books.  Ex. B, Kareem Dep. at 59:25-60:3.  Ms. Kareem testified that "[t]he only threat I have had is through the Ohio Revised Code."  *Id.* at 65:2-3.  And Ms. Kareem made clear that she was not complaining about any specific action of any government official.  *See, e.g.*, *id.* at 65:1-2 ("I have not been personally threatened by a government entity."); *id.* at 73:18-20 ("I have not seen any type of correspondence or attempt to contact me from a government entity.").

Second, as discussed in detail above, Ms. Kareem specifically testified that she has received no communication whatsoever from the Secretary of State's Office concerning ballot

selfies in general or her own posting of a ballot selfie.  Thus, she cannot meet her burden to establish that her alleged subjective chill is causally connected to the action of *this* defendant— that is, the Secretary of State.  *See Lujan*, 504 U.S. at 560.  Accordingly, Ms. Kareem cannot meet either of the first two prongs of standing: (1) she lacks a concrete injury, and (2) any alleged injury she has experienced is not causally connected to the Secretary of State's actions.

### D.     For similar reasons, this case is not ripe for adjudication.

Ms. Kareem's inability to establish standing also means this lawsuit is not ripe.  "The doctrines of standing and ripeness 'originate' from the same Article III limitation."  *Susan B. Anthony List*, 573 U.S. at 157 n.5 (citing *DaimlerChrysler Corp. v. Cuno*, 547 U. S. 332, 335 (2006).  In challenges like this, "the Article III standing and ripeness issues . . . boil down to the same question"—that is, whether the threat of enforcement of the challenged law is "sufficiently imminent."  *Id.* at 157 n.5, 159 (internal quotation marks omitted).  As discussed in detail above, Ms. Kareem cannot establish that enforcement of the ballot-exposure statutes against her is sufficiently imminent (or imminent at all).  Thus, her lawsuit is not ripe, and this Court lacks jurisdiction.

## II.     Regardless, the Court Should Grant Summary Judgment on Ms. Kareem's First Amendment Claim.

Even assuming for the sake of argument that there is subject-matter jurisdiction over Ms. Kareem's lawsuit (there is not), her First Amendment claim still fails on the merits as a matter of law.  The challenged laws easily satisfy intermediate scrutiny, and neither law is overly broad.

For purposes of this summary-judgment motion, the Secretary assumes that Ms. Kareem correctly alleges that these statutes prohibit Ms. Kareem from "[taking] a photograph of her voted or completed ballot," and "posting such photograph on social media so as to not only make an affirmative declaration of having voted, but, more importantly, to advocate to others to support

and to vote for the specific candidates" shown on her ballot.  Compl. ¶ 36, Doc. No. 1 at PageID 9.

Ohio's ballot-exposure ban nonetheless passes constitutional scrutiny.  The ban serves compelling and legitimate state interests—preventing electoral corruption in the forms of vote buying, selling, intimidation, and coercion and preserving the integrity of Ohio's elections. Additionally, the statutes are sufficiently tailored to meet those state interests.  First, because the statutes regulate ballots, which the Supreme Court does not recognize as fora for political expression, the effect on First Amendment rights is not severe.  And second, the statutes only prohibit conduct that confirms vote selections, the key ingredient in the aforementioned election-corruption schemes.  For similar reasons, the ballot-exposure ban also survives Plaintiff's overbreadth challenge.  Because *any* type of ballot display confirms a vote, including displays not directly related to election-corruption schemes, the law does not sweep too broadly in preventing all such displays.

## A.     Ohio's ballot-exposure statutes are content neutral because their application does not depend upon the message conveyed.

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech," and the amendment applies equally to the States.  *Virginia v. Black*, 538 U.S. 343, 358 (2003).  The amendment protects speech as well as expressive conduct, including flag burning, wearing armbands or other insignia, and similar types of expressive activity.  *Project Veritas v. Ohio Elec. Comm.*, 418 F. Supp. 3d 232, 248-49 (S.D. Ohio 2019) (collecting cases).  The First Amendment analysis begins by selecting and applying the appropriate level of scrutiny.  When a government regulation might conflict with free speech or free expression, a court must decide whether the regulation is content based or content neutral.  Content-based restrictions must survive

14

strict scrutiny, while content-neutral regulations need to satisfy only intermediate scrutiny.  *See generally Reed v. Town of Gilbert*, 135 S. Ct. 2218 (2015).

The short answer to the level-of-scrutiny question is that the Sixth Circuit already decided the issue in *Crookston v. Johnson*, 841 F.3d 396 (6th Cir. 2016).  There, the Sixth Circuit considered a preliminary challenge to Michigan's ballot-exposure ban, which prevented a voter from showing a marked ballot to another.  *Id*. at 398 (citing Mich. Comp. Laws § 168.738(2)).  The Sixth Circuit characterized the ballot-exposure ban as a "content-neutral regulation that reasonably protects voters' privacy." *Id*. at 399.  As explained more fully below, Ohio's law shares all the key features with Michigan's law that led the Sixth Circuit to deem the latter content neutral.  There is therefore no reason to depart from the Sixth Circuit's conclusion that a ballot-exposure ban is content neutral.

And the long answer agrees with the short answer.  Under Supreme Court precedent, "a law is content-based if it 'applies to a particular speech because of the topic discussed or the idea or message expressed.'"  *Project Veritas v. Ohio Elec. Comm.*, 418 F. Supp. 3d 232, 258 (S.D. Ohio 2019) (quoting *Reed*, 135 S. Ct. at 2227).  Similarly, a law is content based when it turns on the government's disagreement with the message the speech conveys.  *L.D. Mgmt. Co. v. Gray*, 988 F.3d 836, 839 (6th Cir. 2021).  Content-neutral regulations, on the other hand, apply regardless of topic discussed or message conveyed.  *Project Veritas*, 418 F. Supp. 3d at 258.

Some content-based regulations are readily apparent.  Where, for example, a law restricts billboards advertising off-site activities (Adult Bookstore – Next Exit!), but not those advertising on-site activities (This Land for Sale), the law is content based.  *L.D. Mgmt.*, 988 F.3d at 839.  That is, its application depends on the topic discussed in the speech it regulates.  But not every case is so easy, and not every regulation draws such clear distinctions based on topic or message.

Still, a few election-law examples illustrate the differences between content-based laws and content-neutral laws. A content-based Ohio election law prohibited false information about a political candidate "if the statement is designed to promote the election, nomination, or defeat of the candidate." *Susan B. Anthony List v. Driehaus*, 814 F.3d 466, 470 (6th Cir. 2016) (quoting Ohio Rev. Code § 3517.21(B)(10)). The law's application turned on content in at least two ways: it applied only to *false* statements and only to statements with particular *purposes*. Only an examination of a statement's content—its truthfulness and its purpose—revealed whether the false-statement law applied.

Contrast the false-statement law with the campaign-reporting law in *Project Veritas*, where the underlying regulation was deemed content neutral. There, the plaintiffs challenged an Ohio law regulating the "reporting [of] information to the employee's employer or the agent's principal without the knowledge of the candidate or the candidate's organization" with no restrictions on the topics disclosed or message expressed. *Project Veritas*, 418 F. Supp. 3d at 236 (quoting Ohio Revised Code 3517.21(A)(1)). Unlike *Driehaus*, the campaign-reporting law's application sidestepped any consideration of the statement itself—not its purposes, not its truthfulness or falsity, and not its topic. Rather, the campaign-reporting law applied to *any* communication "without the campaign's knowledge," making it content neutral. *Id*. at 258.

Now, let us apply these principles to so-called ballot-selfie bans. Michigan's ballot-exposure ban prohibited an elector from "show[ing] his or her ballot . . . to any person other than a person lawfully assisting him or her . . . or a minor child accompanying that elector . . . after the ballot has been marked." *Crookston*, 841 F.3d at 399 (quoting Mich. Comp. Laws § 168.738(2)). This even-handed restriction did not turn on the message contained within the ballot or the form of the statement, so it was content neutral. *Id*. at 401 (contrasting Michigan law with other types

16

of ballot-selfie bans).  A similar ballot-exposure ban was characterized as content-neutral by a Colorado district court.  *Hill v. Williams*, Nos. 16-cv-2627, 16-cv-2649, 2016 U.S. Dist. LEXIS 155460, at *28-29 (D. Colo. Nov. 4, 2016) (characterizing a law prohibiting the showing of a ballot "after it is prepared for voting" as a content-neutral law).

True, other courts deemed other restrictions on ballot selfies as content-based, but these laws do not resemble the above ballot-exposure bans.  In Indiana, for example, the court considered a ban specific to ballot selfies, that is, a ban on the digital image or photograph of the voter's ballot—unless taken to document a voting-system issue—distributed or shared "using social media or by any other means."  *Indiana Civ. Liberties Union Found., Inc. v. Indiana Secy. of State*, No. 1:15-cv-1356-SEB-DML, 2015 U.S. Dist. LEXIS 182116, at *2 (S.D. Ind. Oct. 19, 2015) (quoting Indiana Code § 3-11-8-17.5(b)).  The Indiana law was content based, concluded the district court, because it regulated speech according "to its subject matter."  The law applied only to photographs of ballots taken for a reason other than documenting a voting-system issue.  Similarly, a content-based New Hampshire law specifically banned a voter from "taking a digital image or photograph of his or her marked ballot and distributing or sharing the image via social media or by any other means."  *Rideout v. Gardner*, 123 F. Supp. 3d 218, 221 (D.N.H. 2015) (quoting N.H. Rev. Stat. Ann. § 659.35), *aff'd* 838 F.3d 65 (1st Cir. 2016).  As in the Indiana case, the court concluded that the ban was content based because its application turned on subject matter—it applied only to images of marked ballots.[1]

_____

[1] A New York district court diverged from the content-based v. content-neutral paradigm in a challenge to a ballot-exposure ban.  *Silberberg v. Bd. of Elections of N.Y.*, 272 F. Supp. 3d 454 (S.D.N.Y. 2017).  While the court subjected the ban to strict scrutiny, it also deployed a public-forum analysis.  *See id*. at 467-68, 474-78.

Here, the ballot-exposure statutes resemble the ballot-exposure bans in Michigan and Colorado, not the subject-matter-specific photography bans in New Hampshire or Indiana.  Ohio's ballot-exposure statutes evenhandedly prohibit *all* showings or displays of a ballot that the elector intends to cast.  Ohio Rev. Code §§ 3501.35(A)(4), 3599.20.  As the Sixth Circuit recognized in *Crookston*, such laws are not content based because they do not depend on the message conveyed.  That is, Ohio's ballot-exposure laws do not depend on the messaging contained within the ballot, *e.g.,* voting for this candidate, voting "no" on a local levy, voting "yes" on a new constitutional amendment.  And the ballot-exposure bans do not turn on subject matter of the display, whether photography, in-person displays, or video transmissions.  Rather, the laws prohibit *all* displays of the ballot the elector intends to cast.  Like the Michigan law challenged in *Crookston*, Ohio's ballot-exposure ban does not depend on topic, message, subject matter, or intended purpose.  841 F.3d at 399.  Thus, the long answer to the level-of-scrutiny question agrees with the short answer: Ohio's ballot-exposure ban is content neutral.[2]

B.     **The ballot-exposure statutes satisfy constitutional scrutiny because they prohibit conduct that leads to election corruption.**

A content-neutral law survives intermediate scrutiny if "it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater

---

[2] Ms. Kareem alleges that the ballot-exposure statutes are content-based regulations that do not satisfy strict scrutiny. *See, e.g.*, Compl. ¶ 3, Doc. No. 1 at PageID 2.  Although the Court must accept as true all the evidence in the light most favorable to the nonmoving party, it need not accept the nonmoving party's legal arguments or conclusions.  Rather, the Court may resolve questions of law on a motion for summary judgment. *Hill v. Homeward Residential, Inc.*, 799 F.3d 544, 550 (6th Cir. 2015).  Secretary LaRose set forth above why intermediate scrutiny applies to the content-neutral laws at issue here.  But if the Court concludes the statutes are content based, Secretary LaRose notes that the laws would survive strict-scrutiny review as well. *See infra*, footnote 3.

than is essential to the furtherance of that interest." *Project Veritas*, 418 F. Supp. 3d at 258 (citation and quotation marks omitted).  Ohio's ballot-exposure ban easily passes this test.

### 1. <u>Ohio has interests in corruption-free elections.</u>

The ballot-exposure ban advances Ohio's interests in ballot secrecy, preventing vote buying and selling, preventing voter coercion, and reinforcing election integrity.  Few government interests merit higher deference than the sanctity of the election process.  Indeed, "[o]ther rights, even the most basic, are illusory if the right to vote is undermined."  *Wesberry v. Sander*s, 376 U.S. 1, 17 (1964).  To illustrate how the ballot-exposure ban serves the State's interest in free and fair elections, this motion briefly detours to the nineteenth century.

### a. The ballot-exposure bans cleansed Ohio's formerly dirty elections.

Ohio's ban on ballot exposure dates back to the Progressive Era electoral reforms.  Expert Report of Dr. E. Scott Adler at 6, attached hereto as Exhibit C.  In the bad, old days, vote buying and selling were endemic in Ohio and across the country.  *See id*.; *see also Silberberg v. Bd. of Elections of N.Y.*, 272 F. Supp. 3d 454, 471 (S.D.N.Y. 2017) ("[I]n New York, prior to the enactment of the [ballot-exposure] statute, vote buying and voter intimidation were rampant.").  Nineteenth-century elections featured widespread payments for votes, typically $1, but also alcohol, shoes, pants, and bushels of corn.  Ex. C, Adler Report at 4.  One enterprising Ohio voter sold his 1864 vote for Republican Congressman Columbus Delano in exchange for a prize-winning buck's breeding with his ewe.  *Id*.  In the mid- to late-nineteenth century, vote buying was just a way to "get out the vote."

Vote buying blossomed in this era due to the ease of vote confirmation.  That is, a would-be vote buyer could easily assure himself that his $1 actually bought the vote he paid for.  Without a state-provided standardized ballot, political parties printed their own brightly colored ballots—the "party ticket"—to distribute to potential voters.  Ex. C, Adler Report at 4; *see also Burson v.*

*Freeman*, 504 U.S. 191, 200 (1992) (plurality opinion) (noting that ballots were printed with "flamboyant colors, distinctive designs, and emblems").  Vote confirmation was as simple as identifying a ballot's color.  *Id*.  And in this era, votes were not cast in the privacy of the polling place; rather, voters brought their brightly colored and easily identifiable party tickets to place in a ballot box for all to see.  *Id*.; *see also Burson*, 504 U.S. at 200 ("[T]he vote buyer could simply place a ballot in the hands of the bribed voter and watch until he placed it in the polling box.").  In fact, Ohio once required voters to deliver "in full view . . . a single ballot or piece of paper, on which shall be written or printed the names of the persons voted for."  *See* Joseph R. Swan, comp. Statutes of the State of Ohio, of a General Nature, in Force August, 1854: With References to Prior Repealed Laws (1854), at p. 352, attached hereto as Exhibit D.

Easy vote confirmation led to intimidation at the polls, with partisans using coercion and outright violence to keep the "wrong" party tickets out of the ballot boxes.  Jill Lepore, *Rock, Paper, Scissors: How We Used To Vote*, The New Yorker, Oct. 6, 2008, attached hereto as Exhibit E; *Burson*, 504 U.S. at 201 ("Sham battles were frequently engaged in to keep away elderly and timid voters of the opposition.").

Ohio was no exception to these practices, and in fact, embraced them wholeheartedly.  Vote buying became habitual in Adams County, rising to the level of "habit."  Adler Report at 5; *see also* Ex. A, *A County Where Selling Votes Is Universal*, N.Y. Times, Jan. 15, 1911.  Cincinnati, too, saw widespread vote buying and selling using party-printed tickets supplied by the local political machine.  Ex. C, Adler Report at 5.

Beginning in the late 1880s, citizens began to demand clean elections, adopting a suite of electoral reforms called the Australian-ballot reforms.  Ex. C, Adler Report at 3-4.  The reforms completely overhauled how Americans voted, each reform interlocking with others to create a safe

space for civic participation.  First, the State provided an official ballot, "encompassing all candidates of all parties on the same ticket."  *Burson*, 504 U.S. at 202.  Next, the reforms called for polling places staffed by elections officials.  *Id*.  The reforms excluded the general public from the polling place, admitting only voters.  *Id*.  Bribery and intimidation at the polls were criminalized.  *See id*. at 205.  And new laws prohibited electors from showing or displaying their ballots or tickets to others.  Ex. C, Adler Report at 3-4.  Together, these laws created a bribery- and intimidation-free zone in which to cast a private ballot.  Deprived of the means to confirm their bribery or intimidation schemes, election cheaters began to close up shop.  *Id.* at 13-14; *Burson*, 504 U.S. at 203-04.

Ohio enacted its first set of Australian-ballot reforms—including a predecessor of the current ballot-exposure statutes—in 1891.  Ex. C, Adler Report at 6; *see, e.g.*, 1891 Ohio Laws 449, § 14 (standardizing the form of the ballot), § 15 (establishing private polling places), § 21 (prohibiting voters from displaying ballots), attached hereto as Exhibit F.  But entrenched electoral corruption takes time to root out.  Adams County's "boodling," or vote buying, continued into the early 20th century.  Ex. C, Adler Report at 5, 13.  Vote buyers devised ingenious methods to continue to confirm vote selections despite the reforms, including placing carbon paper under the vote seller's ballot.  *Id.* at 13.  Only prosecution of nearly half of the county's eligible voters rendered the practice less attractive.  *Id*.  Likewise, the Cincinnati political machine continued to monitor and confirm the votes of patronage job holders even after the Australian ballot reforms. *Id.* at 14.  As in Adams County, criminal indictments of Cincinnati machine politicians and the continued enforcement of the secret ballot, including the ballot-exposure ban, eventually brought this era to an end.  *Id.*  Ohioans habituated to the Australian-ballot reforms, and ballot secrecy became a civic expectation.

      **b.  Because modern elections provide ample opportunities for vote confirmation, Ohio retains its interests in the ballot-exposure statutes.**

As set forth above, Ohio's interests in preventing vote buying, vote selling, and voter intimidation provided ample justification for the ballot-exposure ban at the time of its passage and through the first half of the twentieth century, when election-corruption schemes still frequently occurred.  *See* Ex. C, Adler Report at 3-7, 13-14.  But now, voters expect standardized ballots, private polling places, and ballot secrecy, and they largely deplore the once-common practices of vote buying and vote selling.  *Id.* at 3.  In fact, many Ohio voters likely have no idea that the Australian ballot has not always existed.

So, what are the State's interests in maintaining a ballot-exposure ban in the twenty-first century?  Quite simply, they remain the same.  True, vote buying and voter intimidation have diminished since the Progressive Era.  *Silberberg*, 272 F. Supp. 3d at 471 ("After New York's adoption of the Australian ballot reforms vote buying and voter intimidation virtually disappeared.").  But they have not disappeared completely.  *See Crookston*, 841 F.3d at 400 (citing *United States v. Robinson*, 813 F.3d 251, 254 (6th Cir. 2016); *United States v. Turner*, 536 F. App'x. 614, 615 (6th Cir. 2013); *United States v. Young*, 516 F. App'x. 599, 600-01 (6th Cir. 2013)); *Silberberg*, 272 F. Supp. 3d at 471 ("[A] handful of vote buying schemes have been uncovered in the last several years.").  With election corruption still a threat, Ohio has an interest in vote secrecy, preventing vote buying and selling, and discouraging voter coercion.

More importantly, however, two unique aspects of twenty-first-century voting make the ballot-exposure ban indispensable in contemporary elections.  First, most Ohio voters now carry a smartphone with a camera at all times.  Ex. C, Adler Report at 15, 20.  Many voters have become accustomed to chronicling their lives pictorially and sharing them on social media, and for them, ballots are just another form of political self-expression.  *See, e.g.*, Compl. ¶ 36, Doc. No. 1 at

PageID 9.  Second, Ohio, among many other states, adopted no-fault absentee voting, which removes ballots from the privacy of the polling place and the oversight of elections officials.  *See* Ohio Rev. Code § 3509.02(A) ("Any qualified elector may vote by absent voter's ballots at an election.").  In the 2020 general election, 2.1 million Ohioans (35% of all votes cast) voted by absentee ballot.  Ex. C, Adler Report at 19.  This means that 2.1 million ballots were voted outside the privacy protections of the polling place.

Taken together, these twenty-first-century developments leave the door wide open to vote confirmation.  In 2022, a voter can snap a photo of her completed ballot and upload it to social media with the swipe of a finger.  Ex. C, Adler Report at 20.   This presents to the potential vote buyer exactly what the buyer needs: vote confirmation.  As one court recognized, "[v]iewing a photograph of an individual along with their marked ballot is an especially efficacious way to verify that the individual in the photograph voted consistent with the marked ballot in the photo, as such a photograph would be more difficult to fake."  *Silberberg*, 272 F. Supp. 3d at 472. And with the internet and social media, a voter can present confirmatory evidence of a completed ballot by text, email, or social media to a would-be vote buyer without ever meeting the buyer.  Ex. C, Adler Report at 20.

Historical evidence in the record establishes that easy vote confirmation typically leads to vote buying, selling, coercion, and intimidation.  Ex. C, Adler Report at 3-7.  And vote buyers in the ballot-selfie age can operate on a much larger scale than was ever possible in the 19th century.  Vote buyers in the 19th century had to haggle for votes face-to-face, one-at-a-time, and even ewe-by-ewe.  Twenty-first century vote buyers never need to leave the couch.  *Id.* at 20.  Maintaining a ballot-exposure ban preserves a culture of ballot secrecy, making widespread vote buying schemes less likely and more difficult to execute.

In addition to vote buying, voter coercion and intimidation also become more likely when ballots are shared.  Ballot-exposure bans render votes unknowable, allowing voters to vote without fear of reprisals.  Ex. C, Adler Report at 14-16.  For example, a husband may publicly agree with his wife's politics, knowing that he is free to vote however he wishes in the privacy of the voting booth.  Employees who work for companies with political leanings need not worry that their vote choices may affect their employment.  But when ballots are shared, opportunities for coercion, intimidation, and retaliation proliferate. *Id.* at 15-17.  Employers can confirm the votes cast by their employees.  Even worse, employers and coworkers might seek to pressure employees into revealing their completed ballots.  *Id.*

Finally, a disclosed ballot could cast a long, damaging shadow over the voter.  A voter expressing support for a ballot initiative through a ballot selfie in 2022 may find herself subject to intimidation or retaliation in 2028 or beyond if an employer, coworker, or neighbor unearths her social media posts.  Ex. C, Adler Report at 16.  Indeed, employers commonly check social media posts of prospective employees, and many employers admit to screening candidates for past social media use, including political posts.  *Id.*

Codifying ballot secrecy advances Ohio's interests in preventing vote buying and vote selling by removing vote confirmation from the vote buyer's toolbox.  Ballot-exposure bans also advance the State's interests in removing intimidation, retaliation, and coercion from the electoral process.  The Sixth Circuit recognized all these interests in *Crookston*, blessing the State's interests in "preserving the privacy of other voters, avoiding delays and distractions at the polls, preventing vote buying, and preventing voter intimidation."  841 F.3d at 400.  These interests apply with equal force here.

### 2. *Ohio's ballot-exposure ban is sufficiently tailored.*

The ballot-exposure ban is sufficiently tailored to serve the State's interests.  None of Ohio's interests—preventing vote buying, vote selling, voter intimidation, and voter coercion and promoting the integrity of elections—relates to the suppression of free expression.  Further, the ballot-exposure ban does not restrict First Amendment rights any more than necessary to protect these interests.

### a. Ballot regulations do not severely restrict First Amendment rights.

To begin the tailoring analysis, the ballot-exposure ban's incidental restriction of First Amendment rights is quite low.  Ms. Kareem characterizes the ballot-exposure ban as an outright ban on core political speech.  *See, e.g.*, Compl. ¶ 3, Doc. No. 1 at PageID 2 (calling the challenged laws "content-based regulations of core political speech that do not satisfy the requirements of strict scrutiny").  But ballots are different; they are not core political speech.  Decades of Supreme Court precedent have differentiated ballots from other forms of political speech.

The Supreme Court has never found that ballots serve as important vehicles for political expression apart from selecting candidates and issues.  Indeed, "[b]allots serve primarily to elect candidates, not as fora for political expression."  *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 363 (1997).  Political parties, for example, have no constitutional right to coopt a ballot for their own political expression.  Thus, it is not a First Amendment violation to prevent a political party without its own candidate from listing another party's candidate as its own on the ballot.  *See id.* at 353-54 (finding that a law prohibiting a candidate from appearing on the ballot as the candidate of more than one party does not violate the First Amendment).  Even if a state's election laws limit a political party's ability to use a ballot "to send a message to the voters and to its

preferred candidate," that law's burden on First Amendment rights is "not severe." *Id*. Ballots are for electing candidates, not for political parties' self-expression.

And the Supreme Court treats individuals just the same way when it comes to ballots. Ballots are not spaces for individual political expression. For example, a voter brought a First Amendment challenge to Hawaii's ban on write-in voting. *See generally Burdick v. Takushi*, 504 U.S. 428 (1992). The voter believed that he had the right to express his political leanings by writing in candidates and that the prohibition discriminated against him based on the message he sought to convey with his write-in ballot. *Burdick*, 504 U.S. at 437-38. Again, the Supreme Court found that voters do not necessarily have a First Amendment right to use ballots and other election processes for political expression. *Id*. at 438, 441. The function of ballots and other election processes "is to winnow out and finally reject all but the chosen candidates, not to provide a means of giving vent to short-range political goals, pique, or personal quarrels." *Id*. at 438 (citation and quotation marks omitted). Indeed, attributing "a generalized expressive function" to ballots and election processes would "undermine the ability of States to operate elections fairly and efficiently." *Id*.

Thus, Ms. Kareem's contention that the ballot-exposure bans regulate "core political speech" misapplies Supreme Court precedent. *See, e.g.*, Compl. ¶¶ 3-4, 39, 44-45, Doc. No. 1 at PageID 2, 9-11. The Supreme Court has never recognized an individual right to use a ballot for political expression other than the selection of candidates and issues. Nor are restrictions on using ballots for individual political expression "severe" for First Amendment purposes. *See Timmons*, 520 U.S. at 353-54; *Burdick*, 504 U.S. at 438. Accordingly, under the applicable tailoring analysis, any incidental burden on Plaintiff's First Amendment rights is—even before considering the State's interests—quite slight.

**b. The ballot-exposure ban is necessary to advance the State's interests.**

But even assuming that the ballot-exposure statutes impose some incidental burden on Ms. Kareem's First Amendment rights, the statutes are sufficiently tailored to survive Ms. Kareem's challenge to them.   That is, the laws prohibit only as much expressive activity as is essential to further the State's interests in clean elections.   The challenged laws prohibit the exhibition or display of a ballot the voter intends to cast, or stated differently, the act of vote confirmation.   And because vote confirmation leads ineluctably to schemes of vote buying and selling and increased risks of voter intimidation and coercion, *see supra* Section II.B.1.a., preventing that act advances the State's interests.

The ballot-exposure bans do not sweep more broadly than necessary.   As in *Crookston*, Ohio voters remain free to advocate for candidates and causes, share their voting choices, and encourage others to vote.   As the Sixth Circuit observed, "[a] picture may be worth a thousand words, but social media users can (and do) post thousands of words about whom they vote for and why."  841 F.3d at 400.   One act only is forbidden: confirming their votes beyond question by displaying their ballots.   Denying vote confirmation to would-be vote buyers or coercers deprives them of the key to successful election corruption.  *Burson*, 504 U.S. at 203.

Ms. Kareem cannot cite existing criminal prohibitions on vote buying and voter intimidation as reasons why the ballot-exposure ban prohibits more activity than necessary. Indeed, the Supreme Court rejected this exact argument in a challenge to an electioneering ban.   It held that election "intimidation and interference laws," standing alone, "fall short of serving" the State's interests in free and fair elections because "they deal with only the most blatant and specific attempts to impede elections."  *Burson*, 504 U.S. at 206-07.   A district court applied *Burson* in a ballot-exposure case to conclude that vote-bribery statutes insufficiently satisfied the State's

interests in preventing election corruption: "history and common sense teach that prohibiting vote buying and voter intimidation are unlikely to be a particularly effective means to combat these evils so long as the perpetrators may verify their target's votes." *Silberberg*, 272 F. Supp. 3d at 472. The same holds true here. Our sometimes-sordid election history teaches that *any* ability to confirm votes leads to election corruption. *See* Ex. C, Adler Report at 13-14. The ballot-exposure ban is therefore *precisely* tailored to the underlying State interests in preventing such corruption.

In any event, Ohio has ample proof that ballot-exposure bans are tailored to serve its stated interests. Evidence in the record shows that other jurisdictions have seen ballot selfies used to perpetrate vote-buying and vote-selling schemes. Ex. C, Adler Report at 20-21. Closer to home, vote-buying and vote-selling schemes continue to plague elections. *See Crookston*, 841 F.3d at 400 (citing *United States v. Robinson*, 813 F.3d 251, 254 (6th Cir. 2016); *United States v. Turner*, 536 F. App'x 614, 615 (6th Cir. 2013); *United States v. Young*, 516 F. App'x 599, 600-01 (6th Cir. 2013)). And most saliently, Ohio knows exactly what happens here when votes can be easily confirmed and ballot-exposure bans do not exist: electoral corruption has festered, including vote buying, vote selling, voter intimidation, and voter coercion. *See supra* Section II.B.1.a. Ohio need not return to the "boodling" days to prove its ballot-exposure ban survives constitutional scrutiny. *Burson*, 504 U.S. at 208.

Because Ms. Kareem's First Amendment freedoms—already at a near nadir when it comes to using ballots for self-expression—are affected only to the extent necessary to achieve the State's interests, Ms. Kareem's First Amendment claim fails as a matter of law.[3]

---

[3] As set forth in footnote 2, *supra*, the challenged laws would also withstand strict scrutiny for all the reasons set forth in *Burson*. There, the Supreme Court upheld a 100-foot electioneering ban on strict-scrutiny review. 504 U.S. at 211. The ballot-exposure statutes serve the same interests that justified the electioneering ban—preserving clean and honest elections—and are equally tailored. *Id.* at 200-11.

### C.      The ballot-exposure statutes are not unconstitutionally broad.

Next, Ms. Kareem asserts that the ballot-exposure statutes are overly broad.  *See, e.g.*, Compl. ¶ 4, Doc. No. 1 at PageID 2 (alleging that the ballot-exposure statutes "are overbroad restrictions on core political speech beyond the scope of any legitimate prohibition").  Typically, overbreadth challenges are facial challenges, allowing courts "to invalidate a law on its face if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Carey v. Wolnitzek*, 614 F.3d 189, 201 (6th Cir. 2010).  But here, Ms. Kareem apparently brings only as-applied challenges to the ballot-exposure statutes, alleging as follows: "To the extent they prohibit the publication or dissemination of a photograph of a voted ballot, i.e., a ballot selfie, Ohio Rev. Code § 3501.35(A)(4) and/or Ohio Rev. Code § 3599.20 constitute overbroad restrictions on core political speech as the scope of any legitimate prohibition within such prohibitions sweeps too widely and encompasses protected political speech within its prohibitions so as to deter constitutionally-protected speech."  Compl. ¶ 45, Doc. No. 1 at PageID 10-11.  That is, Ms. Kareem's overbreadth challenge appears to target the ballot-exposure bans only insofar as they prohibit ballot selfies.

Unconstitutionally overbroad laws reach "a substantial number of impermissible applications relative to the law's legitimate sweep." *Déjà Vu of Nashville, Inc., v. Metro. Gov't of Nashville & Davidson Cty.*, 274 F.3d 377, 387 (6th Cir. 2001).  Because an overly broad law sweeps so much additional speech into its application, the law impermissibly "chills speech outside the purview of its legitimate regulatory purpose." *Id*.  To reach the level of unconstitutionality, the overbreadth "must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973).  A "strong medicine," the overbreadth doctrine "should be employed only as a last resort." *Sensations, Inc. v. City of Grand Rapids*, 526 F.3d 291, 300 (6th Cir. 2008).

Ms. Kareem's overbreadth challenge fails as a matter of law.  To begin, her claim that the ban chills constitutionally protected speech rests on shaky ground.  The ballot-exposure statutes regulate what voters can and cannot do with their ballots.  As set forth above, voters have little in the way of speech rights when it comes to coopting ballots for political self-expression.  *Timmons*, 520 U.S. at 363 ("Ballots serve primarily to elect candidates, not as fora for political expression."); *Burdick*, 504 U.S. at 438 ("Attributing [] a more generalized expressive function to [election processes] would undermine the ability of States to operate elections fairly and efficiently.").  Accordingly, by limiting itself to expressive conduct involving a ballot, the ballot-exposure ban avoids regulating core political speech.

But even if the Court classifies ballot-based expression as core political speech, the ballot-exposure ban does not stray from its legitimate sweep.  True, ballot-exposure bans prevent *all* ballot displays, even those unrelated to schemes of vote buying or vote coercion.  But *any* type of ballot display or exhibition confirms how the voter intends to vote, and vote buying, selling, coercion, and intimidation all depend on vote confirmation.  So long as election cheaters "may verify their target's votes," vote buying and voter intimidation occur.  *Silberberg*, 272 F. Supp. at 472.  Moreover, "history and common sense teach that prohibiting vote buying and voter intimidation" alone are unlikely to effectively combat those evils without ballot-secrecy laws in place as well.  *Id*.  Accordingly, for a ballot-exposure ban to achieve its election-security goals, it must prohibit *all* displays of ballots, including ballot selfies taken for purely expressive reasons.  *See id*.  This logic comes straight from the Supreme Court.  In upholding an electioneering ban, the Court noted that "many acts of interference would go undetected" without the electioneering ban in place.  *Burson*, 504 U.S. at 207.  And these acts "may nonetheless drive the voter away before remedial action can be taken."  *Id*.  Thus, banning *all* electioneering is permissible even

though *some* electioneering may not corrupt.  Ms. Kareem's overbreadth challenge fails as a matter of law.

Ms. Kareem has never been prosecuted under either ballot-exposure statute, has not been warned or threatened with prosecution for posting or taking a ballot selfie, and has no concrete plans to post a ballot selfie in the future.  Such facts do not give rise to standing.  Even considering her case on the merits, Ms. Kareem's claims fail.  Ohio's ballot-exposure laws further the State's unquestionable interest in election security, are content neutral, and easily survive intermediate scrutiny in the face of Ms. Kareem's nominal interest in posting ballot selfies.  Similarly, those laws are not overbroad but rather are essential to Ohio's legitimate regulatory purpose—operating elections fairly and efficiently.  This Court should decline Ms. Kareem's invitation to undermine election-security statutes that have been in place for a century.

## CONCLUSION

For these reasons, Defendant Ohio Secretary of State's Motion for Summary Judgment should be granted.

Respectfully submitted,

DAVE YOST
Ohio Attorney General

*/s/ Ann Yackshaw*
ANN YACKSHAW (0090623)
JULIE M. PFEIFFER (0069762)*
   *Counsel of Record*
ANDREW D. MCCARTNEY (0099853)
Assistant Attorneys General
Constitutional Offices Section
30 East Broad Street, 16th Floor
Columbus, Ohio 43215
Tel: 614-466-2872 | Fax: 614-728-7592
Julie.Pfeiffer@OhioAGO.gov
Ann.Yackshaw@OhioAGO.gov
Andrew.McCartney@OhioAGO.gov

*Counsel for Defendant*
*Ohio Secretary of State Frank LaRose*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 28th day of February, 2022, the foregoing was filed electronically.  Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

*/s/ Ann Yackshaw*
ANN YACKSHAW (0090623)
Assistant Attorney General

**CERTIFICATE OF COMPLIANCE**

Pursuant to Northern District of Ohio Local Civil Rule 7.1(f), I hereby certify that this case has been assigned to the standard track.  *See* Doc. No. 19.  I also certify that the page limitations have been modified by order of the Court, which granted Defendant's motion for leave to file an opening summary-judgment brief of up to 35 pages.  *See* Doc. No. 22.  This memorandum complies with that modification.

*/s/ Ann Yackshaw*
ANN YACKSHAW (0090623)
Assistant Attorney General