# EXHIBIT C

# Expert Report of Dr. E. Scott Adler

**Expert Report of Dr. E. Scott Adler**

***Kareem v. Cuyahoga County Board of Elections*, Case No. 1:20-cv-2457 (N.D. Ohio)**

**Introduction**

Protecting the secrecy of the individual vote has been a central tenet of electoral law in nearly every state in the U.S. for well over a century.  As asserted by the U.S. Sixth Circuit Court of Appeals, "the links between [vote buying and voter intimidation] and the prohibition on ballot exposure are not some historical accident; they are common sense" (*Crookston v. Johnson*, 2016, 400).  According to Keller et al., "[t]oday, all fifty states have provisions in their constitutions for either election by 'secret ballot' or elections in which 'secrecy shall be preserved' which has been interpreted by the courts as an implied requirement for secret balloting" (2006, pp. 314–315).

The long-held importance placed on election ballot secrecy in democracies has been motivated by three primary aims: protecting the right to privacy of personal political beliefs; discouraging the use of coercion against voters; and preventing vote buying (Elklit and Maley 2019). The use of photographic images of completed ballots that reveal both vote choice and the identity of the voter – commonly known in the era of the smartphone as "ballot selfies" – raises considerable concerns about election integrity and both subverts privacy of political beliefs and severely increases the risk of vote buying and coercion.

Ballot selfies provide a relatively new and simple disruption to ballot secrecy – a pillar of a modern democracy – by easily allowing individuals other than the voter to observe or monitor

the choices of citizens at the ballot box with practically no reasonable means of detection.  As set out more fully below, the key impediment to vote buying and voter intimidation schemes in the modern era is the inability to monitor voting on election ballots.  I conclude that ballot selfies make monitoring the votes cast by others easier than at any point since the widespread adoption of the Australian ballot, particularly with the potential sharing of ballot images over a largely public medium like social media.  Ballot selfies drive down the cost and complication of vote buying or voter intimidation to a simple click of a mobile phone; the act of which is currently illegal in the State of Ohio.  Permitting ballot selfies seriously undermines ballot secrecy laws and creates a profound threat to the central structure that has protected elections from corruption and maleficence in Ohio and the nation for well over a century.

This report is organized as follows: First, I provide some background on the history of ballot secrecy in the U.S. and the state of Ohio and its goal of reducing election fraud.  After placing Ohio's ballot secrecy statutes in context of other states' laws, I explain the important logic of ballot secrecy, as well as illustrating how vote buying and voter coercion remain real threats and how those threats can be amplified by the prevalence of completed ballot images shared on social media.  Next, I consider the long-held concerns regarding absentee ballots, but asserting that ballot selfies present a distinct and greater danger to election security.

My CV, which includes a list of publications authored in the past 10 years and a list of all other cases in the past 4 years in which I testified as an expert at trial or by deposition, is attached hereto as Exhibit A.  I am being compensated at a rate of $350 per hour for my testimony in this case.

Adler Report, *Kareem v. Cuyahoga County Board of Elections*

## <u>The Australian Ballot Is Adopted to Combat Widespread Electoral Fraud</u>

Regular and fair elections are fundamental to modern democracies (Katz 1997).  The requirement for a secret ballot is set out in Article 21 of the 1948 Universal Declaration of Human Rights.  The widely cited 1994 Declaration on Criteria for Free and Fair Elections, adopted by the Inter-Parliamentary Council of the Inter-Parliamentary Union – a global association of national parliaments – states that the "right to vote in secret is absolute and shall not be restricted in any manner whatsoever."  Around the world, the secret ballot is a central component for evaluating elections as free and fair (Franck 1992).[1]

Nevertheless, vote buying and voter intimidation are thought to have been around for nearly as long as humans have engaged in the practice of voting, mainly because vote choice is not always kept secret (Yakobson 1995).  As Supreme Court Justice William Brennan stated, "No body politic worthy of being called a democracy entrusts the selection of leaders to a process of auction or barter" (*Brown v. Hartlage*, 1982, 54).  Sentiments are similar in other parts of the world.  In a recent election in Argentina, vote buying was branded by judges assessing the legitimacy of the vote in their country as a "scourge" on its electoral process (Gilbert 2015).

The adoption of the secret ballot has since the Roman Republic been aimed at protecting individual political beliefs and thwarting electoral corruption (Yakobson 1995).  In the United States, the widespread adoption of the "Australian ballot" – which includes provision for secret votes – was part of a set of Progressive Era reforms intended to address the

---

[1] See < http://www.cartercenter.org/peace/democracy/index.html >,
< http://aceproject.org/electoral-advice/archive/questions/replies/705390372>,
<http://www.osce.org/elections>.

Exh. C, P | 3

mounting concern regarding partisan corruption and electoral fraud that was viewed as pervasive in the United States, as well as in Ohio, in the 1800s (Evans 1917; Fortier & Ornstein 2002; Fredman 1968).  Political corruption at the time included such practices as the payment of voters, requiring candidates to compensate party leaders in order to have their names placed on lists of preferred candidates, and stuffing ballot boxes with votes by nonexistent voters (Schaffer 2002; Ware 2000).  Richard Bensel, in his description of elections in the mid-Nineteenth century explains that the most common payment for a vote was a dollar, but that other currency included alcohol, shoes, pants, bushels of corn, and even in one instance in Licking County, Ohio, a voter cast his 1864 ballot for Republican Congressman Columbus Delano on the promise that Mr. Delano's prize-winning buck would breed with his ewe (Bensel 2004, 57-63).

To ensure vote buying schemes would achieve the aim of the buyer, ballots were made identifiable to others observing the process.  In the early years of American elections, voters were expected to supply their own paper ballots with the names of their preferred candidates written upon them.  By the mid-Nineteenth century parties determined that they could better generate votes by supplying voters with a pre-printed ballot bearing their entire slate of favored candidates, often provided in strips or "tickets" in local newspapers.  The phrase "party ticket" comes from the similarity this strip bore to a train ticket of the day (Lepore 2008).  Eventually these ballots became large and brightly colored, and voters often deposited them in separate ballot boxes for each party at the voting window.  This provided a means of revealing vote choice and confirming that the individual paid to vote in a particular manner did in fact carry out their part of the contract.  Bensel (2004, 30) quotes a Republican in Philadelphia in

1868 stating how he knew an individual had voted a Democratic ticket: "First, because they were brought by the democratic precinct politicians; second, because they received their tickets from those having charge of the democratic tickets; and third, because the tickets they voted were tickets with democratic headings, and I saw them; fourth, because democrats vouched for them; and fifth, because the democratic election officers received all their votes."

The experience in Adams County, Ohio in the late-Nineteenth century was symptomatic of what was occurring in many places throughout the United States.  Adams County had a long history of what was called at the time "boodling" – large numbers of citizens selling their vote. Such election "debauchery," was the experience of many voters in the county for several elections (The New York Times 1911; Gist 1961, 62), with Judge Albion Z. Blair claiming such corruption went as far back as 1867 (Blair 1911).  Vote buying emerged more openly in the county by the 1880s with contemporaneous accounts claiming that such fraud was easily facilitated by separate ballot boxes and voters being directly escorted to drop their ballot into specific boxes thus confirming their vote.  By 1890, vote buying in Adams County had become habit in every election (Creel and Gordon 1911, 604; The New York Times 1911).

Judge Blair, eventually a central public figure in the effort to clean up elections in Ohio, claimed that the rest of the state was just as corrupt (Creel and Gordon 1911, 599).  For example, vote buying was relatively commonplace in Boss George Cox's pre-turn-of-the-century Cincinnati prior to the adoption of the secret ballot.  Again, ensuring that execution of a vote buying agreement was carried out as contracted could be done with relative ease in Cincinnati as parties printed their own ballots (Burke 2019).

It was not until the adoption of the secret ballot – depriving election cheaters and political machines of the easy ability to confirm the vote choice of the seller – that political corruption of this kind was cleaned up in the United States.  The broad adoption of the Australian ballot in the United States began in the city of Louisville, Kentucky in 1888. Louisville was followed in the same year by the Commonwealth of Massachusetts and the State of New York (Fitzgerald, Smith, & Goodman 2016, 4).  By 1889, ten states had adopted the Australian ballot, and that number increased to 31 states by 1892 (Fredman 1968).

Among the most important of these Progressive Era reforms was the adoption of laws requiring ballots to be cast in secret. The primary purpose of such balloting systems was to disconnect the ballot's contents from the identity of the voter and ensure the secrecy of the ballot's contents to only those election administrators responsible for tallying the vote count. Hayward notes, "at this time New York state-level reformers wanted to deprive the political machines of the tools necessary to retain control. Some reformers focused on the purchase of votes and voter bribery, and called for 'secret ballot' reform to ensure that these corrupt agreements were not verifiable" (Hayward, 2008, p. 431; see also Holzer, 2008).

Ohio initially adopted the secret ballot during the tenure of Governor James E. Campbell in 1891 (Ohio History Central N.D.).  Charles B. Galbreath (1925) wrote upon Campbell's death about Ohio's adoption of the Australian ballot, "The achievement of this reform that enabled the voter unawed and undisturbed to exercise the 'freeman's will' at the ballot box was one of the most beneficent legislative acts that followed the close of the Civil War."  Ohio's statutes on ballot secrecy have been amended and re-numbered many times since their passage in the late

Nineteenth century, and the relevant portions are now codified at Ohio Rev. Code §§ 3501.35 and 3599.20.

By making ballots secret, public officials removed the mechanism used to confirm that votes were cast in accordance with the conditions of a financial transaction and eliminated the ability of political parties to ''control'' votes.  As well, Australian ballots were also a means of protecting vulnerable voters from intimidation by employers and other individuals in positions of power and influence (Graves 1967; Schaffer 2002).

### Ohio Law Regarding Ballot Secrecy

While all states guarantee a voter's right to a secret ballot, the specific language of those provisions varies from state-to-state.  Thirteen states have state statutes or constitutional provisions that expressly prohibit voters from revealing the contents of their completed ballot. Ohio is among that group of states with language that prohibits voters from revealing the contents of their completed ballot. The others include Alaska, Michigan, Missouri, Montana, Nevada, New York, Oklahoma, Pennsylvania, South Carolina, South Dakota, Texas, and Wyoming.[2]

The relevant portions of Ohio's statutory language are:

---

[2] Alaska Statutes § 15-15-280; Michigan Compiled Laws 168.738; Missouri Statutes 115.637(14); Montana Code 13-35-201(1); Nevada Revised Statutes 293.730(1)(e); Ohio Revised Code § 3599.20; 26 Oklahoma Statutes § 16-115; 25 Pennsylvania Statutes § 3530; Code of Laws of South Carolina 1976 § 7-25-100(A)(1); South Dakota Codified Laws § 12-18-27; Tex. Elec. Code § 61.014; Wyoming Const. Art. 6 § 11.

Exh. C, P | 7

Adler Report, _Kareem v. Cuyahoga County Board of Elections_

- Ohio Rev. Code § 3501.35(A)(4) prohibits, "[d]uring an election and the counting of the ballots", any person from "[e]xhibit[ing] any ticket or ballot which the elector intends to cast".

-  Ohio Rev. Code § 3599.20 prohibits, among other things, any elector from "allow[ing] the elector's ballot to be seen by another … with the apparent intention of letting it be known how the elector is about to vote."

This statutory language is crafted in a way that would seem to prohibit a voter from voluntarily revealing their completed ballot.   Although the statute does not single out ballot selfies or photographs of completed ballots, these statutes could be construed to prohibit showing or revealing such photographs to others.

### **Why Is Ballot Secrecy a Concern?**

 Two concerns were _and remain_ still the primary motivations for enforcing ballot secrecy: vote buying and voter coercion.

_Vote Buying_

Mobilization and voter turnout have always been central to winning elections. Candidates and campaigns employ an array of strategies to entice supporters to the polls. Sometimes these are general distributional strategies for voter mobilization, which often come in the form of material support or remuneration simply focused on encouraging (or discouraging) electoral participation, such as simply turning out voters whose economic or

Exh. C, P | 8

social characteristics make them likely to support a particular candidate or party (Nichter, 2008; Stokes, 2005).

However, absent sufficient restrictions or enforcement mechanisms, candidates can and have engaged in more nefarious distributional strategies at the micro-level to amass votes. They often include: 1) *patronage* or the provision of "material support, at any time during the electoral cycle, to individuals, families, or communities within the context of enduring asymmetric, but reciprocal, relationships" (Schaffer 2007, 5); and 2) *core vote buying* (Hasen 2000) which is "offering particularistic material rewards to individuals or families at election time" (Schaffer 2007, 5).

In these instances, the target of the patronage, or vote seller, and the vote buyer enter into a contract exchanging a vote in favor of a particular candidate or cause for the material benefit or reward.  The execution of the contract, however, can be complicated by the constraint of ballot secrecy.  That is, "prospective vote buyers typically have no guarantees that the voter who accepts their material offers shall dutifully reciprocate on election day" (Schaffer & Schedler 2007, 19).  Sometimes referred to as "slippage" (Lehoucq 2007, 34) or "uncertain compliance" (Schaffer & Schedler 2007, 19), the primary complication is that once in the voting booth the voter can renege on the agreement and vote his or her preference or conscience (Stokes 2005).

From the perspective of the vote buyer, secret ballots make voting opaque which leads to *problematic monitoring*.  When a secret ballot is used, "voter behavior is shielded from direct inspection.  Vote buyers may have great difficulty knowing whether presumptive vote sellers

actually honor their commitments on election day" (Schaffer & Schedler 2007, 20; see also Lehoucq 2007, 35).

Widespread use of secret ballots in the United States dramatically diminished the incidence of vote buying for exactly the reason described above – the difficulty of monitoring the ballot selection of vote sellers.  Individuals determined to continue the practice of vote buying were compelled to develop intricate and often imperfect schemes to ensure the execution of such a vote buying contract.  Schaffer and Schedler recount many of the varied ways throughout modern history such surveillance has occurred, among them the utilization of procured blank ballots that can be filled out in view of the buyer and switched for the provided ballot at the polling station (2007, 23).[3]  One of the more ingenious methods used under conditions of strict polling place supervision (such as what we find in modern U.S. elections) involves an individual who would accompany a vote seller to the polling location and convince the election official that the voter was illiterate so the individual could assist in the voting booth, where the individual would then fill out the ballot for the vote seller (_U.S. v. Smith_ 2005, 682–83).

_Voter Intimidation and Coercion_

Voter intimidation and coercion is in many ways similar to vote buying as a "retail" strategy of electoral manipulation meant to unduly influence the electoral choices of individual voters and violate the democratic norm of free expression of preferences (Schaffer 2007, 7).

---

[3] For more examples, see _U.S. v. Johnson, 2012 WL 3610254 at 1 (E.D.Ky. Aug. 21, 2012); U.S. v. Turner_, 536 F.Appx 614 (6th Cir. 2014); _U.S. v. Shatley_, 448 F.3d 264 (4th Cir. 2006).

Like vote buying, voter coercion compromises not just our democratic ideals of freedom, but also equality: Those who control the votes of others are in effect able to cast multiple votes themselves, in breach of the basic principle of "one person, one vote" (Jones and Simons 202, 350).

Voter intimidation can be subtle, such as when individuals face social pressures to vote in a particular manner by friends, family, or employers.  But it can also occur in ways similar to vote buying, where lost employment or even violence may loom over the heads of voters.  In a 2012 Kentucky mayoral election, for example, voters received threats of eviction from their homes if they did not vote for the incumbent (_U.S. v. Robinson_ 2016, 257–58). In a California case, a "large, physically imposing man" went to voters' homes, forcing them to fill out their absentee ballots in a certain way. Sometimes the intimidated voters were women home alone with their young children (_Stebbins v. White_ 1987, 776–77).

Concerns over voter intimidation, most particularly in the workplace, have not completely disappeared when vote choice is not kept totally secret.  As one recent study shows, employer-induced political activity is relatively common in contemporary America.[4]  Moreover, there are no federal laws prohibiting political discrimination in the workplace (Estlund 1995), and private employers in many states can discipline workers for their political views or compel them to participate in electoral politics (Harvard Law Review 2014; Hertel-Fernandez 2017, 107).

---

[4] Hertel-Fernandez's found that nearly half of the managers surveyed reported that they did at least something to recruit workers into direct political action (2017, 107).  At the same time, about a third of workers contacted by their employer heard a message about voting (Hertel-Fernandez 2016, 413–414).  Of the managers contacting workers, nearly a quarter of those communications were specifically directing the workers to support a particular candidate (Hertel-Fernandez 2017, 415).

Voter intimidation and threats of retribution can also occur *ex post facto*.  If confirmable vote choices are evident after elections are completed, voters may put themselves at risk indefinitely by having shared, voluntarily or involuntarily, their completed ballot.  This is what makes voter intimidation and coercion different and perhaps even more insidious than vote buying – it does not require the willing cooperation of voters.  By having the content of their completed ballots revealed to others, perhaps voluntarily with the mere intent of political expression, voters can unwittingly put themselves at risk of being manipulated and retaliated against.  With the penetration of social media into every aspect of our day-to-day lives, it is unsurprising that many individuals will use social media platforms to express their political views.  This also means that such venues are an opportunity to gather information, including personal political positions, about our friends, family, acquaintances, co-workers, or potential employees.

The attempt to influence the political activity of employees is most effective when employees believe that their activities are being monitored  (Larreguy, Marshall, & Querubín, 2016).  Hertel-Fernandez finds that "employees are much more responsive to employer political requests, especially requests to turn out to vote, when they think their employer might be monitoring their political beliefs and activities" (2017, 112).  Consequently, 44 percent of managers in business and industry firms reported some form of electronic monitoring of their employees (Hertel-Fernandez 2017), and that this type of monitoring of employees is permitted under federal law (Privacy Rights Clearinghouse 2017).

Of course, none of this coercion is feasible unless the vote choice can be confirmed. As previously discussed, the introduction of the Australian ballot reforms, including ballot secrecy

laws, eliminated practices such as the brightly-colored ballot for a specific candidate or party. In doing so, it removed a key manner in which would-be intimidators could confirm their targets' vote selections and thereby severely curtailed wide-spread intimidation and coercion of voters.

### Efforts to Subvert Secret Ballots in Ohio

In the state of Ohio, even after the introduction of the Australian ballot, efforts to undermine ballot secrecy and engage in vote buying schemes continued for several years. Determined election-cheats found alternative means of confirming the execution of vote buying transactions using carbon paper placed under the ballot as it was being marked and provided to the buyer (The New York Times 1911), requiring the seller to vote in a specific pattern so that the ballot would be identifiable upon counting, or merely having election officials "shake open" the ballot before it was placed in the ballot box (Gist 1961, 63).

In Adams County, Ohio, vote buying remained widespread until Judge Blair began an inquiry and prosecution of the practice in 1910.  His criminal investigation resulted in the indictment of somewhere between one-third and one-half of the county's eligible voters (by various counts 1,500-2,000 voters; Blair 1911; Gist 1961).

Similarly, George Cox, a former city councilman and chair of the Hamilton County Republican Committee in turn-of-the-century Cincinnati, influenced a wide variety of city, state, and federal public officials through coercion of voters.  Cox exercised control over approximately 5,000 government jobs for everything from janitor to city engineer, and thereby

the outcome of many local elections. "Each [job holder] was...expected to know and influence the votes of family and neighbors, understanding their jobs depended on it" (Burke 2019).

Even after the introduction of the Australian ballot, Boss Cox's "captains" along with their assistants kept close tabs on votes of all the patronage job holders and their family and friends. Among their many techniques, Cox's precinct executives would observe how much time was spent in the voting booth by each patronage job holder, understanding that the expected straight party vote took little time (Burke 2019).

By the second decade of the Twentieth century, Cox's political machine in Cincinnati succumbed to the growing Progressive political movement that had achieved sufficient momentum among a public that was increasingly tired of rigged elections and corrupt public officials. Like in Adams County, Cox and his political cronies faced indictments for their government corruption and in 1911, with his grip on elections slipping away, an opposition candidate was elected mayor of Cincinnati (Burke 2019). As reformers around Ohio and the nation cleaned up election administration – with secret ballots among the critical reforms – the era of political machines buying and coercing voters came to an end, and so would the machines themselves within the coming decade.

**Ballot Selfies as a Modern Solution to Vote Confirmation**

The notion of ballot secrecy is based on two distinct components of the secrecy provisions: the first is to make it possible for the voter to keep his or her decision private and avoid sanctions from those he or she does not want to know; the second is to make it impossible for the voter to prove how they voted to those they do want to know (Rokkan 1961,

143).  Importantly, changes to polling operations, specifically strictly enforced ballot secrecy where the contents of a specific individual's ballot are only knowable by that voter has historically made efforts at vote buying and intimidation quite difficult to execute. The complicated nature of confirming that the vote buying contract is fulfilled in most instances is what makes most vote buying schemes extremely difficult to pull off on a wide scale.

Photographic images of completed ballots are a relatively new and potentially grave concern for election integrity.  Ballot selfies present a modern-day solution to the confirmation issues faced by would-be conspirators.  First and foremost, photographs of completed ballots taken by voters solve the difficulty of problematic monitoring by providing a reasonable if not entirely definitive level of verification of contract compliance (Schaffer & Schedler 2007, p. 20) through direct evidence.  The photographic or video image (even "live stream"), shared either privately or over social media, becomes the confirmation of the executed agreement.  Given the simplicity of sharing images and videos, there is no need for parties to the contract to meet face-to-face.

Conspirators using photographic ballot images have streamlined and potentially improved upon the traditional vote buying arrangement: The scheme can be done on a wide scale while avoiding any interaction with election officials.  In effect, the ballot selfie shared on social media becomes the modern-day version of the brightly-colored ballot of the pre-Progressive Era reforms that easily permitted party officials to identify the candidate choice of voters.  The ballot selfie permits sellers to reveal their vote out of sight of election officials, potentially out in the open on social media, under the guise of publicly expressed candidate or issue support.  Importantly, the singular difference between a voter stating publicly their vote

choice or perhaps posting a selfie with an "I voted" sticker or even placing a securely concealed ballot in a ballot box *versus* a ballot selfie revealing the vote choice is that the latter has provided documentation to **confirm** the vote.

Additionally, ballot selfies expand the possibility for voter coercion, particularly through employer monitoring of workers.  Keyssar (2009) notes that the history of employer political coercion of workers followed much the same trajectory as vote buying throughout the Nineteenth century, with this form of voter intimidation curbed by the institution of secret ballot and electoral reform laws.  But the rise of ballot selfies may cause employees and others to be compelled to reveal votes on social media either explicitly or through social pressures. Additionally, employees, union members, or others in tight-knit social groups can unwittingly find themselves to be a victim of intimidation or retaliation for a ballot image from elections past shared on social media years earlier.  Increasingly we find that employers are using social media as a key component of background checks.[5]  Several recent surveys of hiring managers say that the vast majority will check job candidates' social media posts before making an offer to hire.  In a 2018 survey, nearly half of the hiring managers say they screen out candidates because of posts about politics, which was second only to posts about drug use (O'Donnell N.D.).  In a different survey in 2020, two of the top three social media posts that hiring managers admitted would negatively impact their decision to hire a candidate were explicit endorsements of presidential candidates (Skynova 2020).

Definitive information about vote choice revealed on social media is a concern because, while employers are prohibited from discriminating against a potential employee due to age,

---

[5] https://www.wsj.com/articles/social-media-histories-upend-hiring-1533503800

gender, religion, disability, national origin, or race,[6] it is still the case that political party affiliation and voting information are not protected classes under Title VII of the Civil Rights Act of 1964 or any other federal law.[7]  Therefore, employers may legally decide against hiring a candidate because they may disagree with the way that individual voted, as confirmed by a ballot selfie.  Perhaps worse, employers may legally fire current employees for not voting how the employer desired.

### Ballot Selfies and Absentee Ballots Present a Uniquely Modern Problem

One important concern, particularly in the State of Ohio, is whether the combination of ballot selfies and widespread absentee voting increases the likelihood of vote buying and voter intimidation.  Ballot selfies, together with absentee voting, provide the missing ingredient from many vote buying and voter intimidation schemes: easy and reliable vote confirmation on a wide scale.

While still overwhelmingly free of vote fraud and corruption, absentee ballots comprise a very large proportion of the known modern-day vote buying cases in the United States (Khan & Carson 2012) and absentee ballots are considered the single largest risk of potential voter fraud (Century Foundation, 67-69).  Absentee ballots, developed in the early Twentieth century, raised new challenges regarding ballot integrity for election officials.  The early and troubled history of absentee ballots in the United Sates is very much tied to concerns over ballot secrecy. Originally created to ensure that soldiers were not disenfranchised when they were away from

---

[6] *Id*.
[7] McNair Law Firm, P.A., *Politics in the Workplace*, 21 No. 1 South Carolina Employment Law Letter 2 (2012)

home, absentee voting eventually swept across the states in the first decades of the Twentieth century as a way to accommodate civilian voters as well.  However, casting ballots beyond the privacy of the voting booth and election officials quickly spawned concerns specifically around fraud and coercion.  Early state-level absentee ballot laws instituted an elaborate set of safeguards and restrictions to ensure ballot security and secrecy, such as the requirement that an affidavit attesting to the identity of the voter be signed by a notary.  States laws considered insufficiently protective of constitutional provisions ensuring a secret ballot were struck down by the courts (Fortier & Ornstein 2002, 492–493).

Over time, as access to absentee ballots was broadened to include nearly all eligible voters in most states, there was a parallel easing of many of the identification restrictions. With the loosening of these constraints, absentee balloting became the more preferred vehicle for vote buying.  As one expert on absentee ballots notes, "The main reason absentee ballots are susceptible to fraud is the separation of both ballot and voter from the polling place, with all of its integrity and privacy protections" (Fortier 2006, p. 54).  Absentee ballots differ from the standard Australian ballot in the ability of the voter, and potentially conspirators, to complete their ballot out of view of poll workers thereby easing the confirmation of a vote buying agreement.

Similar to vote-buying schemes, cases of voters being intimidated to cast a ballot in a particular manner or for a given candidate (Fahrenthold 2012) or compelled to reveal their votes (Moss 2004) quite frequently involve the use of absentee ballots as well.  Again, what's most important is that efforts at voter intimidation and coercion are empty threats without the ability to monitor the voting activity of the target.

Ohio is a state where no-excuse absentee voting is quite prevalent.  Ohio adopted no-excuse absentee voting in 2005, which is similar to 35 other states and the District of Columbia (US Vote Foundation 2021).  According to the Ohio Secretary of State's count, in the 2020 election, 2.1 million voters cast their absentee ballot by mail (or drop box) out of 5.9 million votes cast (approximately 35.6%).  That was a sharp increase over the 1.2 million mail-in absentee votes in the 2016 election, but even at 21.4% in the prior presidential election, Ohio has a relatively high rate of absentee voting.[8]

The critical question regarding absentee ballots: Do absentee ballots alone carry the same risk of vote fraud and subverting election outcomes because of the removal of the ballot from the security and strict control of the polling place or is it the incorporation of photos of completed ballots that significantly elevates this risk?  The answer in my view is that ballot photos are a separate and more serious danger.

The gravest concern with vote buying schemes is that they will be large scale and distort the outcome of elections.  Efforts at large scale vote buying through the use of absentee ballots are rare, very difficult to execute, and easily expose themselves to detection.  Unlike ballot selfies, which require no in-person interaction between vote buyers and sellers, absentee ballot schemes alone – without the use of photographic images – require considerable human resources in the form of a witness present for the execution of the contract: someone must confirm that the execution of the vote agreement has been realized.

Consequently, large scale voter fraud involving absentee ballots is quite uncommon and likely requires a sizable number of individuals and considerable human hours to execute the

---

[8] < https://www.ohiosos.gov/elections/election-results-and-data/>

complicated steps involved. Such was the case in a recent incidence of absentee voter fraud during the 2018 election in North Carolina's 9th congressional district.[9] One former employee described the vote fraud operation using absentee ballots as being one person directing the scheme plus six people working six days a week for two months (Sacks and Steadman 2018).

Alternatively, through the use of ballot photographs, a would-be vote buyer could confirm the execution of contracts with sellers, even on a large scale with relatively little effort or face-to-face interaction. Since nearly every adult American has a mobile phone (97%) and almost all of those are "smart phones" (85%),[10] access to a camera and the internet is as simple as reaching into one's own pocket. Regardless of whether voters are using in-person voting or absentee ballots, a large-scale vote buying operation is greatly facilitated through the incorporation of ballot photos where presentation of confirmatory evidence of an executed vote can be done using a swipe of a finger without ever leaving the couch. This is not the case with absentee ballots alone. Moreover, the vote buyer might never need to communicate directly with the vote seller or sellers who can merely post the confirmation of their fulfilled contract on a social media platform. To election observers and law enforcement officials, such a vote fraud scheme simply looks like an innocent act of public political expression.

As early as 2003, reports existed that cell phones were being used in the execution of vote buying schemes in exactly the way described in Italy (BBC News 2003). More recently,

---

[9] Additionally, cases of large scale voter fraud using absentee ballots are quite often detected because the distribution of vote across the various candidates and different vote methods – in-person balloting versus absentee ballots – are far out of proportion (Moss, 2004). This gross mismatch in the distribution of vote for the two major candidates between absentee ballots and the in-person vote ultimately revealed the vote fraud in North Carolina (Bitzer 2018, Scott 2019, Herron 2019), and has done so similarly in school board (Liptak 2012) and small-town mayoral races (Gillespie 2017).

[10] https://www.pewresearch.org/internet/fact-sheet/mobile/

Mexico's 2012 presidential election was tainted in part by what was believed to be wide-spread vote buying facilitated by the use of cell phone photos of completed ballots "proving" individuals had voted for the PRI party, and thus securing the payment of pre-paid gift cards (Associated Press 2012).  As it stands now, ballot secrecy laws in the state of Ohio prevent such vote corruption from undermining election integrity and distorting outcomes.

## Conclusion

This report has addressed the reasoning behind the existence of ballot secrecy – to protect voters and their ability to freely exercise their political beliefs and to uphold the integrity of the electoral process. Political parties largely abandoned the "market" for votes when they were no longer able to verify voters' choices on their election ballots (Heckelman 1995, 115), and political machines for the most part disintegrated over the subsequent decades.  Additionally, the presence of intimidating political machines was effectively eradicated when these electoral cartels could no longer confirm the vote choices of citizens under their influence (Hasen 2000; Fortier and Ornstein 2002).

Elections where votes are not kept in the strictest of confidence put voters at risk of intimidation or coercion and open the process of free and fair elections to the prospect of fraud through vote buying schemes.  Permitting vote buying and voter intimidation effectively corrupts the entire electoral process by canceling out the votes of both perpetrators and those uninvolved in the schemes.  However, what makes such electoral fraud particularly insidious as compared to other ways to distort the outcome of elections (e.g. stuffing ballot boxes,

Exh. C, P | 21

unregistered voters casting votes, corrupt election officials, etc.) is that vote buying and intimidation have historically been aimed at vulnerable, poor populations, effectively disenfranchising such groups of citizens by perverting their vote choice (Stokes 2005).  It is only these types of voters, those for whom a relatively small compensation is meaningful enough to subvert their vote choice, for whom offers to purchase their ballot would be effective.

 Allowing individuals to show their completed ballot via photographic images shared privately or through social media threatens the integrity of the election process.  One critical condition Lehoucq identifies for vote buying to flourish is that parties must be able to monitor the behavior of their agents (Lehoucq 2007, 42–43).  This is where ballot selfies provide a dangerous expansion of opportunity.  Ballot selfies make monitoring voters in this exchange easier than ever.  Ballot selfies cut out the difficult, expensive and potentially illegal process of either monitoring votes through the inappropriate use of absentee ballots or the corruption of poll workers.  Ballot selfies drive down the cost and complication of vote buying to a simple click of a mobile phone.  By using ballot selfies, conspirators have no concern for detection due to mismatched vote distributions between absentee and in-person voting as well.  Under this confluence of conditions, the incentives for vote buying expand considerably.

 Similarly, the prospect of monitoring vote choice through ballot selfies simplifies the opportunity for voter intimidation and coercion.  We know that workers are more susceptible to the influences of employers when they believe they are being monitored, and that a good portion of firms do engage in this form of monitoring.  The same would be true of voter intimidation by unions, family units, or even social groups.  Moreover, the evidence presented

Adler Report, *Kareem v. Cuyahoga County Board of Elections*

here shows that vote buying and voter coercion are ongoing concerns in both the United States and in other countries.

Therefore, ballot selfies are more than just voters celebrating their democratic rights. They pose a threat to election integrity that should be taken seriously.  Statutes enshrining ballot secrecy into law serve the state's interests in maintaining free and fair elections. Technology only strengthens the need for these types of laws.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: October 13, 2021



_____

E. Scott Adler

Exh. C, P | 23

Adler Report, *Kareem v. Cuyahoga County Board of Elections*

**Bibliography**

Associated Press. (2012, July 4). "This is a national embarrassment": Mexican opposition blasts

PRI as vote-buying accusations mar election | National Post. *National Post*. Retrieved

from http://nationalpost.com/news/this-is-a-national-embarrassment-mexico-

opposition-blasts-pri-as-vote-buying-accusations-mar-election/wcm/4b4a3db3-545d-

4d9b-b414-1357bd9b7755

BBC News. (2003, May 16). Mafia turns to 3G video phones. Retrieved from

http://news.bbc.co.uk/2/hi/technology/3033551.stm

Bensel, R. (2004). The American Ballot Box in the Mid-Nineteenth Century.  New York:

Cambridge University Press

Bitzer, M. (2018, December 3). NC's Competitive, and Now Contested, 9th Congressional

District, *Old North State Politics Blog*

<http://www.oldnorthstatepolitics.com/2018/12/NCs-9th-competitive-and-contested-

CD.html>

Blair, A. Z. (1911, November 11). Seventeen hundred Rural Vote Sellers: How We

Disenfranchised a Quarter of the Voting Population of Adams County, Ohio, *McClure's*

*Magazine*, 38.

*Brown v. Hartlage*, 465 U.S. 45 (1982)

Burke, T. (2019, December 3). The Cox Machine, *Cincinnati History Blog*

<https://www.cincinnatihistory.org/post/the-cox-machine>

Exh. C, P | 24

Century Foundation. (2005). Balancing Access And Integrity: A Report of The Century

      Foundation Working Group on State Implementation of Election Reform. New York: _The_

      _Century Foundation Press_.

Creel, G. and Gordon, S. (1911). What Are You Going to Do About It?  The Shame of Ohio,

      _Cosmopolitan Magazine_, pp. 599-610.

_Crookston v. Johnson_, 841 F.3d 396 (6th Cir. 2016)

Elklit, J. and Maley, M. (2019). Why Ballot Secrecy Still Matters, _Journal of Democracy_, 30: 61-

      75.

Estlund, C. L. (1995). Free Speech and Due Process in the Workplace. _Indiana Law Journal_, _71_,

      101–152.

Evans, E. C. (1917). _A History of the Australian Ballot System in the United States_ (Dissertation).

      University of Chicago. Retrieved from

      http://books.google.com/books?hl=en&lr=&id=gWtDAAAAIAAJ&oi=fnd&pg=PP9&dq=pr

      ogressive+era+reforms+australian+ballot&ots=fttZJOaEo3&sig=_DYFv7XxawAM-

      pLWdsiUPxnV2Ac#v=onepage&q=&f=false

Fahrenthold, D. A. (2012, October 1). Selling votes is common type of election fraud.

      _Washington Post_. Retrieved from

      https://www.washingtonpost.com/politics/decision2012/selling-votes-is-common-type-

      of-election-fraud/2012/10/01/f8f5045a-071d-11e2-81ba-ffe35a7b6542_story.html

Fitzgerald, C., Smith, P., & Goodman, S. (2016). _The Secret Ballot at Risk: Recommendations for_

      _Protecting Democracy_. Washington, D.C.: Electronic Privacy Information Center, Verified

      Voting Foundation, and Common Cause. Retrieved from http://secretballotatrisk.org/

Fortier, J. C. (2006). *Absentee and Early Voting*. Washington, D.C.: AEI Press. Retrieved from

http://www.aei.org/publication/absentee-and-early-voting/

Fortier, J. C., & Ornstein, N. J. (2002). The Absentee Ballot and the Secret Ballot: Challenges for

Election Reform Symposium: Election Reform. *University of Michigan Journal of Law

Reform*, *36*, 483–516.

Franck, T. (1992). "The Emerging Right to Democratic Governance." *The American Journal of

International Law* 86: 46–91.

Fredman, L. E. (1968). *The Australian Ballot: The Story of an American Reform*. East Lansing, MI:

Michigan State University Press.

Galbreath, C. B. (1925).  James Edwin Campbell: In Memoriam, *Ohio History Journal*. 34: 2-24.

Gilbert, J. (2015, October 23). New Scrutiny on Vote Buying as Argentine Elections Near. *The

New York Times*. Retrieved from

https://www.nytimes.com/2015/10/24/world/americas/argentina-elections-cristina-

kirchner.html

Gillespie, R. (2017, May 19).  Former Eatonville mayor found guilty of voting fraud, election

violations.  *Orlando Sentinel*  < https://www.orlandosentinel.com/news/breaking-

news/os-anthony-grant-trial-verdict-20170519-story.html>

Gist, G. B. (1961). Progressive Reform in a Rural Community: The Adams County Vote-Fraud

Case, *The Mississippi Valley Historical Review*, 48, pp. 60-78.

Graves, J. W. (1967). Negro Disfranchisement in Arkansas. *The Arkansas Historical Quarterly*,

*26*(3), 199–225.

Harvard Law Review. (2014). Citizens United at Work: How the Landmark Decision Legalized Political Coercion in the Workplace Note. *Harvard Law Review*, *128*, 669–690.

Hasen, R. L. (2000). Vote Buying. *California Law Review*, *88*, 1323–1372.

Hayward, A. R. (2008). Revisiting the Fable of Reform. *Harvard Journal on Legislation*, *45*, 421–470.

Herron, M. C. (2019) Mail-In Absentee Ballot Anomalies in North Carolina's 9th Congressional District. *Election Law Journal, 18*

Hertel-Fernandez, A. (2017). American Employers as Political Machines. *The Journal of Politics*, *79*(1), 105–117. https://doi.org/10.1086/687995

Hertel-Fernandez, A. (2016). How Employers Recruit Their Workers into Politics--And Why Political Scientists Should Care. *Perspectives on Politics*, *14*, 410–421.

Holzer, B. (2008). Political Vote Buying Statutes: Textual Limits, Enforcement Challenges, and the Need for Reform Note. *New York University Journal of Legislation and Public Policy*, *12*, 211–224.

*Foundation, Inc. v. IN Secretary of State*, 229 F.Supp.3d 817 (S.D. IN. 2017)

Jones, D. J. and Simons, B. (2012). Broken Ballots: Will Your Vote Count? Stanford: CSLI Publications.

Katz, R. 1997. Democracy and Elections. Oxford, UK: Oxford University Press.

Keller, A., Mertz, D., Hall, J., & Urken, A. (2006). Privacy Issues in an Electronic Voting Machine. In K. Strandburg & D. S. Raicu (Eds.), *Privacy and Technologies of Identity: A Cross-Disciplinary Conversation* (pp. 313–334). New York: Springer Science+Business Media, Inc. Retrieved from http://dx.doi.org/10.1007/0-387-28222-X_18

Exh. C, P | 27

Keyssar, A. (2009). *The Right to Vote: The Contested History of Democracy in the United States* (Revised edition). New York: Basic Books.

Khan, N., & Carson, C. (2012, August 12). Comprehensive Database of U.S. Voter Fraud Uncovers No Evidence That Photo ID Is Needed. Retrieved July 6, 2017, from https://votingrights.news21.com/article/election-fraud/

Larreguy, H., Marshall, J., & Querubín, P. (2016, February). Parties, Brokers, and Voter Mobilization: How Turnout Buying Depends Upon the Party's Capacity to Monitor Brokers. https://doi.org/10.1017/S0003055415000593

Lehoucq, F. (2003). Electoral Fraud: Causes, Types, and Consequences. *Annual Review of Political Science*, *6*(1), 233–256. https://doi.org/10.1146/annurev.polisci.6.121901.085655

Lehoucq, F. (2007). When Does a Market for Votes Emerge? In F. C. Schaffer (Ed.), *Elections for Sale: The Causes and Consequences of Vote Buying* (pp. 33–45). Boulder, CO: Lynne Rienner Publishers, Inc.

Lepore, J. (2008, October 6). Rock, Paper, Scissors: How we used to vote. *The New Yorker* <https://www.newyorker.com/magazine/2008/10/13/rock-paper-scissors>

Liptak, A.  (2012, October 6). Error and Fraud at Issue as Absentee Voting Rises. *The New York Times*

Moss, M. (2004, September 13). Absentee Votes Worry Officials as Nov. 2 Nears. *The New York Times*. Retrieved from https://www.nytimes.com/2004/09/13/politics/campaign/absentee-votes-worry-officials-as-nov-2-nears.html

Exh. C, P | 28

Adler Report, _Kareem v. Cuyahoga County Board of Elections_

New York Times (1911, January 15).  A County Where Selling Votes is Universal" _The New York Times_

Nichter, S. (2008). Vote Buying or Turnout Buying? Machine Politics and the Secret Ballot. _American Political Science Review_, _102_, 19–31.

O'Donnell, J. T. (N.D.) 47 Percent of Hiring Managers Say Doing This on Social Media Costs You the Job, Inc. Newsletter, < https://www.inc.com/jt-odonnell/47-percent-of-hiring-managers-say-doing-this-on-social-media-costs-you-job.html>

Ohio History Central. (N.D.) "Australian Ballot," _Ohio History Central Blog_ <https://ohiohistorycentral.org/w/Australian_Ballot>

Privacy Rights Clearinghouse. (2017). _Workplace Privacy and Employee Monitoring_. San Diego, CA. Retrieved from https://www.privacyrights.org/consumer-guides/workplace-privacy-and-employee-monitoring

Rokkan, S. (1961). Mass Suffrage, Secret Voting and Political Participation, _European Journal of Sociology_, 2

Sacks, B. and Steadman, O. (2018, December 5) Inside The North Carolina Republican Vote Machine: Cash, Pills — And Ballots, _Buzzfeed News_, < https://www.buzzfeednews.com/article/briannasacks/dowless-britt-inside-north-carolina-absentee-ballot-machine>

Schaffer, F. C. (2002). Might Cleaning up Elections Keep People Away from the Polls? Historical and Comparative Perspectives. _International Political Science Review_, _23_(1), 69–84.

Exh. C, P | 29

Schaffer, F. C. (2007). Why Study Vote Buying? In F. C. Schaffer (Ed.), *Elections for Sale: The Causes and Consequences of Vote Buying* (pp. 1–16). Boulder, CO: Lynne Rienner Publishers, Inc.

Schaffer, F. C., & Schedler, A. (2007). What is Vote Buying? In F. C. Schaffer (Ed.), *Elections for Sale: The Causes and Consequences of Vote Buying* (pp. 17–30). Boulder, CO: Lynne Rienner Publishers, Inc.

Scott, D. (2019).  "North Carolina operative indicted in ballot fraud scandal that led to new House election" *Vox*, Feb. 27.  Retrieved from https://www.vox.com/policy-and-politics/2019/2/18/18229711/north-carolina-election-fraud-leslie-mcrae-dowless-indictment

Skynova. (2020). The Impact of Political Posts on Hiring.  Skynova Blog. <https://www.skynova.com/blog/the-impact-of-political-posts-on-hiring>

*Stebbins v. White,* 190 Cal. App. 3d 769 (1987).

Stokes, S. C. (2005). Perverse Accountability: A Formal Model of Machine Politics with Evidence from Argentina. *American Political Science Review*. https://doi.org/10.1017/S0003055405051683

US Vote Foundation. (2021).  Absentee Ballot Request and Voter Registration Services for All U.S. Voters in All States at Home and Abroad, U.S. Vote Foundation Blog. <https://www.usvotefoundation.org/vote/state-elections/state-voting-laws-requirements.htm>

*U.S. v. Robinson,* 813 F.3rd 251 (6th Cir. 2016).

*U.S. v. Smith*, 139 F.Appx. 681 (6th Cir. 2005).

Exh. C, P | 30

Ware, A. (2000). Anti-Partism and Party Control of Political Reform in the United States: The

Case of the Australian Ballot. _British Journal of Political Science_, _30_(1), 1–29.

Yakobson, A. (1995). Secret Ballot and Its Effects in the Late Roman Republic, _Hermes_

123, pp. 426-442.

Biography

Prof. E. Scott Adler received his Ph.D. in Political Science from Columbia University in 1996, and

has been teaching in the Department of Political Science at the University of Colorado Boulder

since 1996.  Prof. Adler's specialty is American politics, with a focus on the U.S. Congress,

congressional organization and reform, elections, and constituencies.  Since 1992, he has taught

general courses in American politics, including the history, administration, and implications of

elections and voting.  In 2004, Prof. Adler designed and began teaching a course titled, "U.S.

Campaigns and Elections," which was eventually approved by the College of Arts and Sciences

at the University of Colorado as a permanent part of the Department's roster of courses and

has for many years been included as a course that fulfills one of the core requirements in the

college.

Prof. Adler has also conducted research on the history of elections and election administration

in the United States.  In 2013, Adler along with elections expert, Thad Hall, published their

article "Ballots, Transparency, and Democracy" in the _Election Law Journal_.  The article

examines the implications of allowing public access to completed election ballots.  Chapter 4 of

his book, <u>Why Congressional Reforms Fail</u> (University of Chicago Press, 2002), includes an

examination of the effects that Progressive Era reforms, particularly the institution of direct

primaries and the introduction of the Australian ballot, had on the representation relationship

between lawmakers and constituents.

Since 2019 Prof. Adler has been Dean of the Graduate School and Vice Provost for Graduate

Affairs at the University of Colorado Boulder.

In 2017 Prof. Adler has testified as an expert at trial in *Silberberg v. Board of Elections of N.Y.*, 272

     F.Supp.3d 454 (S.D.N.Y. 2017)

Exh. C, P | 32