**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| ALISON KAREEM, | ) | CASE NO. 1:20-cv-02457 |
| | ) | |
| Plaintiff, | ) | JUDGE DAVID A. RUIZ |
| | ) | |
| v. | ) | |
| | ) | |
| CUYAHOGA COUNTY BOARD OF | ) | |
| ELECTIONS, *et al.*, | ) | **MEMORANDUM, OPINION, & ORDER** |
| | ) | **ON SUMMARY JUDGMENT** |
| Defendants. | ) | |

## I.  INTRODUCTION

This case concerns Plaintiff's facial and/or as applied constitutional challenge to Ohio Revised Code sections 3501.35(A)(4) and 3599.20. Plaintiff describes these statutes as "ballot selfie" laws, a categorization of long-standing prohibitions on displaying election ballots. With fingertip access to smartphone cameras, voters can take pictures of their completed ballots and immediately post them on social media sites. This action and the statutes come under review.

Relying upon 42 U.S.C. § 1983, Plaintiff Alison Kareem challenges these Ohio statutes, claiming they violate her First Amendment right to freedom of speech, as incorporated against the states by the Fourteenth Amendment. (R. 1, PageID 10-11). She asserts the laws do not satisfy the requisite level of scrutiny and are overbroad. (*Id.*). Seeking declaratory and injunctive relief, Plaintiff asks the Court to enjoin the Cuyahoga County Board of Elections (BOE), the Cuyahoga County Prosecuting Attorney Michael O'Malley (O'Malley) (collectively County Defendants), and Ohio Secretary of State Frank LaRose (the State) from prohibiting ballot selfies. (*Id.* at 11-12).

The Court initially granted summary judgment for Defendants and dismissed the case, finding Plaintiff lacked standing to challenge the laws. (R. 40). Plaintiff appealed, (R. 42), and the United States Court of Appeals for the Sixth Circuit reversed, holding that Plaintiff satisfied Article III standing requirements. (R. 43). *See Kareem v. Cuyahoga Cnty. Bd. of Elections*, 95 F.4th 1019 (6th Cir. 2024). The Circuit remanded the case for proceedings on the merits, and the matter is before the Court upon the renewed cross-motions for summary judgment. (R. 46; 02/25/2025 Non Document Order).The Motions have been fully briefed. (R. 24; R. 26; R. 27; R. 30; R. 32; R. 33; R. 34; R. 35; R. 36; R. 37).

For the following reasons, the Court grants the Motions of the State (R. 24) and the County Defendants (R. 26) and denies Plaintiff's Motion (R. 27).

## II.  BACKGROUND FACTS

On October 20, 2020, Plaintiff and her brother visited the BOE during its early voting period. (R. 1, PageID 8-9; R. 27, PageID 524). Before casting her vote, Plaintiff took a photograph of herself and had her brother take a picture of her. (R. 24-2, PageID 204-05). The completed ballot was visible in these pictures. (*Id.*; R. 1 at 9). She intended to post the picture(s) on social media, hoping to persuade others to vote for the same candidates. (*Id.*). But because of the laws she now challenges, Plaintiff refrained from doing so. (R. 1 at 9; R. 24-2 at 155, 174; R. 28, PageID 569).

Plaintiff has known about the laws banning ballot exposure since 2015. (R. 24-2 at 181-88). At that time, she voted on a statewide ballot initiative to legalize medical marijuana. (*Id.* at 186-87). She took a picture of her ballot and posted it to her private Facebook account. (*Id.*). She later learned this could constitute a crime and removed the post. (*Id.*). She was not sanctioned, prosecuted, threatened, or even asked to remove the post. (*Id.* at 186-87, 199, 206-07).

The parties agree that election officials throughout Cuyahoga County and the State have

informed voters – whether orally, by posting notifications in manuals and written correspondence, or through media and social media outlets – that posting or publication of a ballot selfie, which is a photo of oneself showing a completed election ballot,[1] is a crime under Ohio's election laws. (R. 1 at 4-5; R. 27, PageID 525-26; R. 26-1, PageID 366-70, 374-76, Ex. 4, 5, 6) (citing *Election Officials Manual*, Chapter 4, § 1.11 (02/03/2021)).

In support of her case, Plaintiff quotes a public declaration by the former Director of the County BOE that if he discovered or learned of a person posting a ballot selfie, "[he would] track down that individual, tell them about the law, and ask them to remove it." (R. 27 at 525-26) (citing R. 26-1 at 838 ¶¶12-15, 392-393, 405, ¶¶11-19; https://www.youtube.com/%20watch?v=awueOPswbGU)). Also in support of her case, Plaintiff points to Spencer Vago, a Strongsville, Ohio City Council candidate, who removed his ballot photo from Facebook upon being informed it was illegal to post the picture. (R. 1 at 7; R. 26-1 at 379-81, 437-39, Ex. 7; R. 26-2, PageID 486-87, 519-20, Ex. 8). Vago was not charged with any crime, *(id.)*, and Plaintiff is unaware of any person in Ohio, who has been prosecuted for posting a ballot selfie. (R. 26-1 at 197). Finally, Plaintiff points to conflicting opinions of elections officials from other counties on whether such conduct violates the law, asserting the State has "not repudiated or corrected" these declarations. (R. 1 at 7-8) (citing https://www.wtol.com/ article/news/politics/campaign-2020/what-to-know-before-you-vote-in-ohio/512-8f0577a0-5a2f-400d-a058-f2036892dca0[2] and a Facebook post of the Columbiana County Democratic Women's Caucus).

Plaintiff has not – herself – posted a picture of her ballot. She therefore has not specifically been censored or criminally charged. Plaintiff, however, filed this action motivated by a desire to

---

[1]      Ballot selfies - Ballotpedia

[2]      Page no longer found.

post ballot selfies in future elections. As the material facts are largely undisputed, this case comes down to whether these laws do or do not unlawfully infringe upon First Amendment speech rights.

## III.  BASES FOR SUMMARY JUDGMENT MOTIONS

### A.  *Summary of Plaintiff's Motion*

Plaintiff argues for a strict scrutiny level of review, arguing the statutes at issue are illegal content-based restrictions on core political speech. (R. 27, PageID 529-31). Vote buying and voter intimidation, she asserts, are not "actual present harm(s)," so interests in preventing such behaviors are not compelling, and less restrictive alternatives to banning ballot exposure already exist in Ohio law. (*Id.* at 531-34). She further contends the laws fail First Amendment review even under intermediate scrutiny, because in preventing all ballot selfies, "they burden substantially more speech than is necessary." (*Id.* at 536-40; R. 33, PageID 628-32, 643-52).

### B.  *Summary of the County Defendants' Motion*

The County Defendants do not focus on merit-based claims in their Motion. Instead, they rely on affirmative defenses, particularly Eleventh Amendment immunity, *Monell,* standing, and a statute of limitations argument. (R. 26, PageID 329-35). But in opposition to Plaintiff's Motion, they argue intermediate scrutiny applies, and the laws nevertheless satisfy even strict scrutiny because the state still has *compelling* interests in preventing vote buying and voter intimidation, and the statutes are sufficiently tailored to those interests. (*Id.* at 335).

### C.  *Summary of the State's Motion*

With the standing issues resolved, the State seeks judgment based on Ohio's history of voter intimidation and corruption, which are the underlying reasons for the laws at issue. (R. 24, PageID 100). The State argues the law is content-neutral because the application does not depend on the message or statement the voter conveys by "exhibiting or displaying the ballot," and therefore,

4

intermediate scrutiny is the applicable standard of review. (*Id.* at 102, 116-26). The State additionally asserts the interests of maintaining privacy in elections, free of voter intimidation, coercion, vote buying, and disruption are substantial, when compared to Plaintiff's claimed First Amendment rights. Therefore, the State asserts the laws must be upheld as they are sufficiently tailored to achieve these State interests. (*Id.* at 102). Finally, contends the State, the laws are not overbroad so as to prohibit *all* ballot exposures. (*Id.*).

## IV.    LAW & ANALYSIS

### A.  *Summary Judgment Standard*

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine issue of material fact exists when evidence that would be admissible at trial – viewed in the light most favorable to the nonmoving party – "is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Peffer v. Stephens*, 880 F.3d 256, 262 (6th Cir. 2018); *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

"The standards upon which [a court] evaluates motions for summary judgment do not change when, [as here], 'both parties seek to resolve [the] case through the vehicle of cross-motions for summary judgment.'" *Craig v. Bridges Bros. Trucking LLC*, 823 F.3d 382, 387 (6th Cir. 2016) (alteration in original) (quoting *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)). The Court "evaluate[s] each party's motion on its own merits…draw[ing] all reasonable inferences against the party whose motion is under consideration." *Id.*

### B.  *The Statutes at Issue*

Ohio Revised Code § 3501.35(A)(4) is part of a comprehensive statute entitled, "No Loitering

or congregating near polling places." The text provides in relevant part:

> (A) During an election and the counting of the ballots, no person shall…:
> (1) Loiter, congregate, or engage in any kind of election campaigning within the area between the polling place and the small flags of the United States placed on the thoroughfares and walkways leading to the polling place, and if the line of electors waiting to vote extends beyond those small flags, within ten feet of any elector in that line;
> (2) In any manner hinder or delay an elector in reaching or leaving the place fixed for casting the elector's ballot;
> (3) Give, tender, or exhibit any ballot or ticket to any person other than the elector's own ballot to the precinct election officials within the area between the polling place and the small flags of the United States placed on the thoroughfares and walkways leading to the polling place, and if the line of electors waiting to vote extends beyond those small flags, within ten feet of any elector in that line;
> **(4) Exhibit any ticket or ballot which the elector intends to cast;**
> (5) Solicit or in any manner attempt to influence any elector in casting the elector's vote.\*\*\*.

*Id*. (emphasis added).

First enacted as Title XIV "Elections" of Ohio's Revised Statutes, the statute was part of "the Purity in Elections Act." It was unlawful for a person "within such distance of seventy-five feet to give or to tender or to exhibit any ballot or ticket to any person other than a judge of election, or to exhibit any ticket or ballot which he intends to cast, or solicit or in any way attempt to influence any elector in casting his vote." Laws of Ohio, Rev. Stat. §§ 2926f, 2938, 2950. (Apr. 15, 1889).[3] This law has not substantially changed over time. In 1921, when the Revised Statutes were converted to Ohio's General Code, this law became § 4979, and the language was slightly modified to more closely mirror the language used today.[4]  Throckmorton, Cleveland: Baldwin Law Pub. Co (1921).

---

[3]      Session Laws Library - HeinOnline.org

[4]      The law became part of Title 35 of the Ohio Revised Code when the Bureau of Code Revision renumbered the General Code in 1953 with virtually the same language used today. *See* Baldwin's Ohio Rev. Code Ann. (1953). The statutory language was reconfigured and ultimately restructured into the present subsections. *See* passage of 151 v H 3, § 1, 151 Ohio Laws 5551, 5628 (eff. 5-2-2006).

A violation of § 3501.35 is a first-degree misdemeanor, Ohio Rev. Code § 3599.40, punishable by up to six months' imprisonment. Ohio Rev. Code § 2929.24.

The second law challenged, Ohio Rev. Code § 3599.20, provides:

> No person shall attempt to induce an elector to show how the elector marked the elector's ballot at an election; or, **being an elector, allow the elector's ballot to be seen by another, except as provided by section 3505.24 of the Revised Code, with the apparent intention of letting it be known how the elector is about to vote**; or make a false statement as to the elector's ability to mark the ballot; **or knowingly mark the ballot so it may be identified after it has been cast**; or attempt to interfere with an elector in the voting booth when marking the elector's ballot; or knowingly destroy or mutilate a lawful ballot; or remove from the polling place or be found in unlawful possession of a lawful ballot outside the enclosure provided for voting; or knowingly hinder or delay the delivery of a lawful ballot to a person entitled to receive it; or give to an elector a ballot printed or written contrary to law; or forge or falsely make an official indorsement on a ballot.

*Id*. (emphasis added). The secret ballot law was part of a comprehensive set of statutes entitled "Public Elections," designed to illegalize intimidation tactics. *See* Gen. Code § 4785-210 (voter intimidation);[5] § 4785-214 (election officer intimidation); § 4785-218 (law enforcement officers to

---

[5] Gen. Code § 4785-210. Secret ballot, originally read:
Whoever attempts to induce an elector to show how he marked his ballot at an election; or, being an elector, allows his ballot to be seen by another, except as provided by law, with the apparent intention of letting it be known how he is about to vote; or makes a false statement as to his ability to mark his ballot; or purposely marks his ballot so it may be identified after it has been cast; or whoever attempts to interfere with an elector in the voting booth when marking his ballot; or wilfully [sic] destroys or mutilates a lawful ballot; or removes from the polling place or is found in unlawful possession of a lawful ballot outside the enclosure provided for voting; or wilfully [sic] hinders or delays the delivery of a lawful ballot to a person entitled to receive it; or gives to an elector a ballot printed or written contrary to the provisions of law; or forges or falsely makes an official endorsement on a ballot; shall, upon conviction thereof, be fined not less than twenty-five nor more than five hundred dollars, or imprisoned in the county jail not more than six months, or both.

The last amendments to §3599.20 were made in 1997. At that time the words "purposely" and "willfully" were changed to "knowingly," and the outlined fine and imprisonment term was changed to the current language "guilty of a felony of the Fifth Degree." *See* Am. Sub. S.B. No. 116, 147 v S 116. (eff. 12-9-97).

comply with election judicial orders); § 4785-221 (two or more congregating at polls). 113 Ohio Laws 307, 312, 314, 315, 317 (eff. Jan. 1, 1930). *See* the General Code of the State of Ohio, containing all laws of a general nature in force to Jan. 1, 1921, edited by Archibald H. Throckmorton, *et al.* (Baldwin, 1921). In 1953, this law was published in the new Ohio Revised Code and renamed to "Prohibitions concerning ballots generally." The language was substantially the same as that challenged, except today, a violation of §3599.20 is a "felony of the fifth degree," punishable by up to twelve months' imprisonment. Ohio Rev. Code §§ 3599.20; 2929.14(A)(5).

The parties agree that these statutes prohibit an elector from taking and posting ballot selfies. (*See* R. 1, PageID 10, ¶ 43; R. 24, PageID 111-12; R. 26, PageID 335; R. 27, PageID 521). Nor is there any dispute that the Ohio Revised Code has other statutes specifically prohibiting vote buying, vote selling, voter intimidation, employer voter intimidation and interference, vote coercion, and attempting to induce voters to expose their marked ballots. *See* Ohio Rev. Code. §§ 3599.01(A); 3599.02; 3599.06.

### C. First Amendment Analysis

#### 1. Content-Based vs. Content-Neutral Restrictions and the Level of Scrutiny Applied

The First Amendment provides, "Congress shall make no law…abridging the freedom of speech." U.S. Const. Amend. I. Thus in America, speech is constitutionally shielded unless it falls within one of the narrow exceptions of unprotected speech (*i.e.,* defamation, fraud, fighting words, obscenity, threats, child pornography). The Supreme Court has instructed – through decades of jurisprudence – that First Amendment protections extend to individual speech and associative rights "in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *See Roberts v. U.S. Jaycees,* 468 U.S. 609, 622 (1984).

Plaintiff argues the challenged laws restrict "core political speech." Political speech is a

8

foundation upon which the constitution was designed and is "at the core of First Amendment protections." *Susan B. Anthony List v. Driehaus,* 814 F.3d 466, 473 (6th Cir. 2016) (striking Ohio's laws prohibiting persons from disseminating false information about a political candidate during the campaign season as content-based restrictions) (citing *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346 (1995) (Ohio's statutory prohibition against distribution of any anonymous campaign literature violated First Amendment)). Thus, the First Amendment's protections are strongest because the ability to engage freely in such speech is integral to self-government. *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011).

Political speech includes discussion of government affairs, criticism of public officials, campaign finance, distributing leaflets, petitions to the government, and symbolic acts like burning flags or displaying clothing or insignia to peacefully protest. *See e.g. Citizens United v. Federal Elec. Comm'n.,* 558 U.S. 310 (2010); *McCutcheon* v. *Fed. Elec. Comm'n.,* 572 U.S. 185, 134 S. Ct. 1434 (2014); *NAACP v. Claiborn Hardware Co.,* 458 U.S. 886 (1982); *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1989); *Texas v. Johnson,* 491 U.S. 397 (1989).

The level of scrutiny applicable to state laws restricting speech varies depending on whether the laws at issue are content-based or content-neutral. *See Reed v. Town of Gilbert*, 576 U.S. 155, 163-64 (2015). "[I]f a law applies to particular speech because of the topic discussed or the idea or message expressed," it is content-based. *Reed*, 576 U.S. at 163. Thus, courts must "consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys." *Id.* (quoting *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 564 (2011)). Similarly, "laws that cannot be justified without reference to the content of the regulated speech, or that were adopted by the government because of a disagreement with the message conveyed" are also content-based. *Id.* at 164 (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).

9

Content-based restrictions on speech are subject to strict scrutiny, "which requires the [g]overnment to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Ariz. Free Enter. Club's Freedom Club PAC*, 564 U.S. at 734 (quoting *Citizens United v. Fed. Election Comm'n*, 558 U.S. at 340)). Narrow tailoring requires that the statute be "the least restrictive means among available, effective alternatives." *Ashcroft v. Am. Civ Lib. Union*, 542 U.S. 656, 666 (2004).

Whereas a speech restriction is content-neutral if it "serves purposes unrelated to the content of expression, even if it has an incidental effect on some speakers or messages but not others." *Ward*, 491 U.S. at 791 (citing *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47-48 (1986)). "Government regulation of expressive activity is content-neutral so long as it is 'justified without reference to the content of the regulated speech.'" *Id.* (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)).

Content-neutral restrictions are subject to intermediate scrutiny, which requires that they be "narrowly tailored to serve a significant (versus compelling) governmental interest" and "leave open ample alternative channels for communication of the information." *Id.* Under intermediate scrutiny, narrow tailoring does not require that the restriction at issue be "the least restrictive or intrusive means of serving the government's interests." *McCullen v. Coakley*, 573 U.S. 464, 486 (2014) (quoting *Ward*, 491 U.S. at 798). Rather, the means chosen must not "burden substantially more speech than is necessary to further the government's legitimate interests." *Turner Broad. Sys. v. F.C.C.*, 512 U.S. 622, 662 (1994) (quoting *Ward* at 799).

### 2. *The courts are split on the level of review applied to ballot selfie laws.*

The issue of whether ballot selfie bans are an impermissible infringement on First Amendment speech rights has not been extensively litigated. Of the handful of decisions, one thing

10

is clear. There is no consistency in the courts' analysis and application. The Court will take time to discuss some of these cases.

### a.  *Rideout v. Gardner (I) – Applying Strict Scrutiny*

The first case – and one upon which Plaintiff relies – concerned a New Hampshire statute entitled, "Showing or Specially Marking Ballot." This law prohibited voters from "allow[ing]…ballots to be seen by any person with the intention of letting it be known how he or she is about to vote or how he or she has voted…." N.H. Rev. Stat. Ann. § 659:35. The law also prohibited voters from writing in candidates' names or affixing a distinguishing mark on the ballot. *Id.*. In 2014, the statute was amended to include a specific prohibition against "taking a digital image or photograph of [a] marked ballot and distributing or sharing the image via social media or by other means." § 659:35 (Rev. 2014). At this time, the penalty for violations was reduced from a misdemeanor to a fine. *Id.* (citing N.H. Rev. Stat. Ann. § 651:20).

In addressing the constitutionality of this law, the New Hampshire District Court ruled the statute failed as a content-based restriction, finding the prohibition only pertained to selfies of marked ballots, while unmarked and faxed ballots, and photos of anything else, could be shared without restriction. *Rideout v. Gardner,* 123 F. Supp.3d 218, 224 (D.N.H. 2015). The court rejected the state's arguments that the law was just a partial ban and merely a time, place, and manner restriction. The court further rejected arguments of government speech and prohibition on a nonpublic forum, which would have supported its constitutionality. *Id.* at 230-31.

In applying strict scrutiny, the court found – to be compelling – a governmental interest must address an actual problem, and the state had produced no evidence[6] of vote buying or coercion

---

[6]     The Secretary of State, in defending the law, pointed to a single instance of vote buying in 2012, but it was not confirmed.

11

(acknowledged by the court as once significant problems) since the late 1800's. *Id.* at 231-33. The government, relying on *Burson v. Freeman,* 504 U.S. 191 (1992), where a Supreme Court plurality denied a First Amendment challenge to a state's ban on campaign-related speech within 100 feet of a polling place, argued content-based restrictions can still be justified without evidence of actual or current threat.

Rejecting this argument, the court distinguished the case, noting the challenged law had just been amended one year prior, specifically to ban ballot selfies and thus could not be tied to historical evidence of fraud. *Id.* at 233. Finally, held the court, the law was not sufficiently narrowly tailored to further a compelling interest because the means will "punish only the innocent (those who only seek to make a political point) while leaving actual participants in vote buying and voter coercion schemes unscathed." *Id.* at 234-35. And the state failed to explain why less intrusive means (*i.e.,* adopting a law illegalizing use of ballot selfies to intimidate or coerce) would be ineffective. *Id.*

### b. *Rideout v. Gardner (II) – Applying Intermediate Scrutiny*

On appeal, the United States Court of Appeals for the First Circuit affirmed *Rideout I*. The Court concluded that the statute was facially unconstitutional, applying only intermediate scrutiny. *Rideout v. Gardner,* 838 F.3d 65, 72 (1st Cir. 2016) (citing *McCutcheon,* 572 U.S. 185, 134 S. Ct. at 1446) ("[I]ntermediate scrutiny is not satisfied by the assertion of abstract interests….")). Noting that digital photography, the internet, and social media have been "ubiquitous for several election cycles, without being shown to have the effect of furthering vote buying or voter intimidation," the court held the state failed to support the restriction. *Id.* at 73. And even if it could, the court held the statute was not narrowly tailored as the state did not demonstrate other voter corruption laws were inadequate to address the problems. *Id.* at 74.

12

   **c.  *Indiana Civil Liberties Union Foundation, Inc. v. Indiana Sec'y of State –
         Applying Strict Scrutiny***

Plaintiff also relies on *Indiana Civ, Lib. Union Found. v. Indiana Sec'y. of State,* 229 F.

Supp.3d 817 (S.D. Ind. 2017). This court, on cross-motions for summary judgment,[7] declared the

following code provision a content-based restriction on speech:

> (a) Voters may use cellular telephones or other electronic devices in the polls as
>     long as electioneering or loud or disruptive conversations do not occur.

> (b) A voter may not do the following:

> (1) **Take a digital image or photograph of the voter's ballot while the voter is
> in a polling place,** an office of the circuit court clerk (under IC 3–11–10–26), a
> satellite office established under IC 3–11–10–26.3, or a vote center established
> under IC 3–11–18.1–4, *except to document and report to a precinct officer, the
> county election board, or the election division a problem with the functioning of the
> voting system.*

> (2) **Distribute or share the image described in subdivision (1) using social
> media or by any other means.**

Ind. Code § 3–11–8–17.5. (eff. 2015) (emphasis added).

The district court rejected the defendants' argument that the law was content-neutral because

it banned all photography in the polling place, as inaccurate, because the laws allowed photographs

of anything, except ballots, while in the polling place. 229 F. Supp.3d at 823 (citing Ind. Code § 3-

11-8-17.5(a)). The court also rejected the state's secondary argument that the law banned both

marked and unmarked ballots, finding the state allowed voters to take photos of ballots to

"document and report…problem[s] with the…voting system." *Id.* at 817. Therefore, held the court,

---

[7]     Two years prior, the same court granted the plaintiff's motion for preliminary injunction,
finding the plaintiff had demonstrated a likelihood of success on the merits. *Indiana Civ. Lib. Union
Found. Inc. v. Indiana Sec'y of State,* No. 1:15-cv-01356, 2015 WL 12030168, at *9 (S.D. Ind. Oct.
19, 2015) ("Ind. Code § 3-11-8-17.5 embodies a content-based restriction on speech that cannot
survive strict scrutiny because it neither serves compelling state interests nor is narrowly tailored to
achieve those interests.").

treating ballot photos differently based on the purpose was "another hallmark of content-based regulation." *Id.*

Under a strict scrutiny analysis, the court held the government could not support its compelling interest (preventing vote buying). The state relied on a 2015 Pew Research Study, which found 64% of Americans use smartphones, and 67% of those share pictures about community events. Yet the court found this evidence "flies in the face of the state's inability to produce a single instance of [someone using a phone] to facilitate vote buying or voter coercion." *Id.* at 825. And therefore, even if the law was enacted to prevent such future crimes, it was not narrowly tailored to achieve that specific state interest. "[W]e fail to see how banning voters from taking photos of *unmarked* ballots…serves the statute's goal of protecting voters…[and] even the prohibition on taking and sharing pictures of unmarked ballots draws into its ambit [legally innocuous] voters." *Id.* at 825-86. Thus held the court, even under the lesser content-neutral intermediate scrutiny analysis, the law still failed constitutional muster as it was "overly inclusive," failing to "address or target significant state interests." *Id.* at 827-28.

### d.  *Hill v. Williams – Applying Intermediate Scrutiny*

A Colorado District Court struck down a state election statute under intermediate scrutiny. In *Hill v. Williams,* Nos. 16-cv-02627, 16-cv-2649, 2016 WL 8667798 (D. Colo. Nov. 4, 2016), a state senator, a Libertarian Party official, a county public defender, a first-time voter/selfie taker, a mail-in-voter, and a voter branded a "criminal for posting her ballot on Facebook," sought an injunction against the Secretary of State, the Colorado Attorney General, and law enforcement officials to stop enforcement of the following state law:

> **[N]o voter shall show his ballot after it is prepared for voting to any person in such a way as to reveal its contents**. No voter shall place any mark upon his ballot by means of which it can be identified as the one voted by him, and no other mark shall be placed on the ballot…to identify it after it has been prepared for voting.

Violation is [a] misdemeanor with fine up to $1,000 and/or up to 1 year in jail.

Col. Rev. Stat. § 1-13-712(1) <u>Disclosing or identifying vote</u> (1891) (amend. 1980, 2017).

That court applied a content-neutral intermediate scrutiny analysis finding plaintiffs had a "substantial likelihood of success on the merits." 2016 WL 8667798, at *9-11. The court enjoined defendants from enforcing the law, just four days before the 2016 Presidential election. Balancing the state's interests in election integrity against plaintiffs' speech rights, the court found the government's interests "significant," but not sufficiently narrowly tailored, emphasizing the "problematic" criminal penalties and no mens rea element in the statutory language. *Id.* Plaintiff also relies on this decision in support of her Motion and asserted claims.

### e. *Silberberg v. Bd. of Elections of New York – Applying Strict Scrutiny Analysis & Finding Content-Based Viewpoint Neutral Restriction*

Conversely, Defendants rely on the Southern District of New York's decision in *Silberberg v. Bd. of Elections of N.Y.*, 272 F. Supp.3d 454 (S.D.N.Y. 2017). Three voters sought to enjoin N.Y. Elec. Law § 17-130(10): "Any person who ... [s]hows his ballot after it is prepared for voting, to any person so as to reveal the contents ... is guilty of a misdemeanor." Noting the law had been on the books "in substantially the same form for 127 years," the last-minute injunctive challenge – filed just thirteen days prior to the election – was not convincing to the court.[8] 454 F. Supp.3d at 462.

Despite finding this statute restricted ballot selfies, the court provided a detailed analysis supporting the law. After determining that "[p]osting a photograph of one's marked ballot to social media is indisputably a potent form of political speech, presumptively entitled to protection under

---

[8]  As in *Indiana Civ. Lib.,* the Southern District of New York also previously ruled on the plaintiff's motion for preliminary injunction. But unlike the Indiana court, this district court denied the motion, finding the voters had standing, but had failed to demonstrate success on the merits. *See Silberberg v. Bd. of Elections of the State of New York,* 216 F. Supp.3d 411 (S.D.N.Y. 2016).

the First Amendment[,]" the court ruled the statute survived strict scrutiny:

> In sum, an examination of the history of election regulation in this country reveals a persistent battle against two evils: voter intimidation and election fraud. After an unsuccessful experiment with an unofficial ballot system, all 50 States, together with numerous other Western democracies, settled on the same solution: a secret ballot secured in part by a restricted zone around the voting compartments. We find that this widespread and time-tested consensus demonstrates that some restricted zone is necessary in order to serve the States' compelling interests in preventing voter intimidation and election fraud.

*Id.* at 469-70 (citing *Burson*, 504 U.S. at 206) (upholding 100-foot campaigning ban)). The statute prohibited showing another a marked ballot, regardless of the content – whether it pertained to a particular candidate, a ballot initiative, or a referendum. *Id.* at 475. "The law's effect is essentially to prohibit individuals from using the medium of a marked ballot for expressive conduct… and does not ban…sharing a photograph of an unmarked ballot with a message written on it." *Id.*

As an alternative basis for supporting constitutionality of the challenged law, the *Silberberg* Court applied the Supreme Court's forum-analysis precedent, holding a polling site is a "non-public forum," and ballots are likewise not "public fora." *Id.* at 475-77 (citing *Timmons v. Twin Cities Area New Party,* 520 U.S. 351 (1997)):

> Because polling sites are opened by the government only for the specific purpose of enabling voters to cast ballots and are not historically open for public debate or speech generally, and the necessary limits on speech within polling sites to ensure orderly and efficient elections, the Court concludes that they are non-public fora. Other courts that have addressed this question agree….

*Id.* at 476-78 (citing, among other cases, *United Food & Com. Workers Local 1099 v. City of Sidney,* 364 F.3d 738, 749 (6th Cir. 2004) ("By opening up portions of school and private property for use as polling places…, Ohio has not opened up a nontraditional forum for public discourse.")). Thus, under this analysis, the court found the statute was a "reasonable viewpoint neutral" restriction of speech that did not contravene the First or Fourteenth Amendments. *Id.* at 478.

### f. *Crookston v. Johnson* – Applying Intermediate Scrutiny

Defendants also rely on *Crookston v. Johnson,* 841 F.3d 396 (6th Cir. 2015) for support. In that case, the Sixth Circuit addressed Michigan's ballot selfie laws:

> Sec. 579**.** If an elector, **after marking his or her ballot, exposes it to any person in a manner likely to reveal the name of any candidate for whom the elector voted**, the board of election inspectors shall reject the ballot and the elector shall forfeit the right to vote at the primary. A note of the occurrence shall be made upon the poll list opposite the name of the elector. \*\*\*.

Mich. Comp. Laws Ann. § 168.579 (emphasis added).

> If an elector **shows his or her ballot or any part of the ballot to any person other than a person lawfully assisting him or her in the preparation of the ballot….after the ballot has been marked, to disclose any part of the face of the ballot**, the ballot shall not be deposited in the ballot box, but shall be marked "rejected for exposure", and shall be disposed of.… If an elector exposes his or her ballot…the elector shall not be allowed to vote at the election.

Mich. Comp. Laws Ann. § 168.738 (emphasis added).

Of note, the Michigan Secretary of State was vested with authority to investigate and refer violations of these provisions for prosecution. Mich. Comp. Laws § 168.31(h).

While the case came before the Circuit on an emergency motion to stay the lower court's preliminary injunction, Chief Judge Sutton provided a roadmap of the direction the case should take if decided on the merits. Finding the ban appeared to be a content-neutral regulation that "reasonably protects voters' privacy – and honors a long tradition of protecting the secret ballot," the Court foreshadowed that a restriction on a ballot selfie does not "significantly impinge[]" on First Amendment rights. *Id.* at 399-400 (citing *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 328 (6th Cir. 2009) (en banc)).[9] Moreover, found the court, even if not content-neutral, the law

---

[9] The Court notes Judge Guy concurred, but focused on the government's argument that ballot selfies would also cause delays at often busy polling places:

> This raises the question of how much delay does taking a selfie cause? There is no

would nevertheless pass constitutional muster, first because a polling place is not a public forum, and next because the state could further compelling interests in protecting the right to freely vote in "an election 'conducted with integrity and reliability.'" *Id.* at 400 (citing *Burson, supra,* 504 U.S. at 198-99, 216).

The court found the state's policy advanced the same "serious governmental interests" as those asserted here (preventing vote buying and voter intimidation, as well as preserving the privacy of other voters[10] and avoiding delays and distractions at the polls[11]). *Id.* And unlike the *Rideout and Indiana Civ. Lib.* Courts, the *Crookston* Court rejected the plaintiff's arguments concerning lack of current evidence of vote-buying schemes or intimidation. *Id.* Instead, the court found "plenty of cases – in this circuit alone – [that] show otherwise." *Id.* (citing *United States v. Robinson*, 813 F.3d 251, 254 (6th Cir. 2016) (affirming a vote-buying conviction); *United States v. Turner*, 536 Fed. Appx. 614, 615 (6th Cir. 2013) (same); *United States v. Young*, 516 Fed. Appx. 599, 600-01 (6th Cir. 2013) (same)). The court noted, "…links between these problems and the prohibition on ballot exposure are not some historical accident; they are "common sense." *Crookston*, 841 F.3d at 400.

---

easy answer to that question. *** If all a person wants is a picture of the ballot that can be done by securing a sample ballot and taking a picture of it. But that is not a selfie for the obvious reason that there is no self. As to how many might avail themselves of the opportunity to take a selfie, I don't really know. But I do know that the number of persons who feel compelled to record their every waking moment and broadly share it with others is immense.

841 F.3d at 401 (internal quotations omitted).

Finally, Judge Cole, dissented. He, however, did not determine whether the law was content-based or neutral because he found the law failed intermediate scrutiny, and Michigan failed to prove the law prevented viable threats to the election process. Following the rationale of the First Circuit and the Indiana District Court, he opined the law was not narrowly tailored. 841 F.3d at 403-04.

[10] *See* R.24, PageID 100, 113; R. 24-3, PageID 234, 251.

[11] *Id.* at 122.

Finding *Rideout* and *Ind. Civil Liberties* thoughtful opinions, the court distinguished these cases because the laws at issue in those cases were targeted at ballot selfies; they were not (as in this case), a general ban on ballot exposure/photographs at the polls. *Id.* at 401. Also of significance was the fact neither the plaintiff, nor anyone else, had been fined or threatened with criminal sanctions, and the Michigan Secretary of State had stated she would not prosecute such violations.

### 3.  The Ohio statutes are Content-Neutral

Plaintiff argues that the applicable laws restrict core political speech and do not satisfy strict scrutiny. (R. 27, PageID 532-34). In making this argument, Plaintiff stakes a claim that these laws restrict only the display of marked ballots during an election. (*Id.* at 530-31) (citing *Indiana Civ. Liberties Union Found. Inc.*, *supra* and *Rideout, supra.*). Defendants respond that the laws are content-neutral, but nonetheless assert they satisfy both strict and intermediate scrutiny. (R. 30, PageID 580-92; R. 32, PageID 601). Defendants contend the government's interests are compelling because these harms persist and would worsen if ballot selfies were permitted. (R. 30 at 581-83, R. 32 at 601). They argue that the statutes are narrowly tailored because Ohio's other laws alone do not sufficiently address these harms. (*Id.*). Moreover, Plaintiff has "[a]lternative opportunities to communicate the message" she seeks to share. (R. 30 at 589-92).

The Court does not read the statutory language as only restricting marked ballots, as Plaintiff argues, and further finds the reasoning of *Crookston* and *Silberberg* most compelling. The Ohio laws at issue, naturally are limited to the election process, but that does not – alone – render them content-based. As in *Silverberg* and *Crookston,* Ohio's ballot laws were enacted years ago as part of a vast effort to afford voters privacy and address corruption and crime. These laws have remained virtually unchanged over time. The subject matter of § 3501.35 ranges from loitering at polling places and hindering or delaying electors to solicitation of votes and tendering ballots to non-

19

election officials. This is all in addition to prohibiting the exhibition of one's ballot, which § 3599.20 also restricts.

These laws are justified without reference to their content and were not adopted because of any disagreement with any other voter's message. In fact, they are silent as to photographs, contemplating instead a wide range of subject matter.[12] They do not restrict ballot selfies because of any particular candidate, party, idea, referendum, initiative, levy, or other asserted political speech. They apply equally to partisan and non-partisan matters. Ohio has banned showing ballots with the intent to show how the elector intends to vote, as part of a comprehensive set of election laws, written with intentions of protection not suppression.

Therefore, the Court finds the laws are content-neutral.

### 4. *Because the laws are content-neutral, the Court employs intermediate scrutiny, and finds they are narrowly tailored to serve significant governmental interests.*

Neither party disputes the historical underpinnings behind secret ballot and voter protection laws. The successors to Ohio's original ballot secrecy statutes remain enshrined in the Ohio Revised Code. Defendants assert Ohio's interests in preventing vote buying and voter intimidation (*e.g.* when persons in positions of power - like employers - use social pressure, influence, and threats to unduly influence voting choices) are compelling. (R. 24, PageID 126 n.3; R. 24-3, PageID 240-44; R. 30, PageID 581-82; R. 32, PageID 601). *See Burson v. Freeman*, 504 U.S. at 206. In support, the State points to historical articles outlining the evils of vote selling. (R. 24 at 100). And the State's

---

[12]    The statutes are silent as to marked versus unmarked ballots. Use of the phrases, "which the elector intends to cast," and "with the apparent intention of letting it be known how the elector is about to vote," *suggest* marked ballots, but unlike the Michigan, Colorado, New York, and New Hampshire statutes, the Ohio statutes do not use the words "marked" or "after it is prepared for voting," which solidly distinguishes marked from unmarked ballots.

20

expert gives detailed historical data and context in support. (R. 24-3 at 236-40, 249).[13]

But in alignment with *Rideout, Indiana Civ. Lib., and Hill,* Plaintiff argues that the statutes do not satisfy strict (or intermediate) scrutiny because the interests the government asserts are compelling "only in the abstract" and are not "real and actual present harms in" Ohio. (R. 27, PageID 532-34). Plaintiff contends no evidence supports these same concerns exist today.

The Court disagrees, and in doing so also distinguishes *Rideout v. Gardner*. There, the statute was amended to specifically prohibit ballot selfies; whereas here, the challenged laws have been largely unchanged for decades. Further, in *Rideout*, the court's decision largely rested on lack of modern day vote buying or voter coercion evidence. 838 F.3d at 73. By contrast, as noted by the *Crookston* Court and also by Defendants' expert, Ohio has continued to experience issues with vote buying and voter intimidation since the state adopted the Australian ballot reforms long ago. *See, e.g.*, *Kunkle v. Q-Mark, Inc.*, No. 3:13-cv-82, 2013 WL 3288398, at *1-6 (S.D. Ohio June 28, 2013) (finding the plaintiff plausibly alleged that her employer fired her because she voted for President Obama); *State v. Hubbard*, No. C-920685, 1993 WL 293323, at *1 (Ohio Ct. App. Aug. 4, 1993) (mayor convicted on interference of the electoral process due to his threats to coerce people to vote for him); *State v. Adkins*, No. 1307, 1982 WL 3346, at *1-8 (Ohio Ct. App. Jan. 20, 1982) (affirming conviction for vote buying).

For similar reasons, the Court also distinguishes this case from *Indiana Civ. Lib. Union Foundation v. Indiana Sec'y. of State, supra.* That statute also was amended to specifically exclude

---

[13]     As the State's expert witness, Dr. E. Scott Adler, Ph.D., explained, "widespread adoption of the 'Australian ballot' – which includes provision for secret votes – " was happening across the United States in the 1800's, including in Ohio. (R. 24-3 at 236, 239). These reforms included adopting the "secret ballot," which ensured the contents were only visible to officials responsible for tallying votes; "removed the mechanism" of vote confirmation and eliminated the ability of political parties to "control the vote," thus protecting Ohio voters. (*Id.* at 239-40).

ballot selfies; whereas Ohio's laws were not. In addition, the Ohio laws contain the requisite mens rea language ("with apparent intention"), lacking in the Indiana Code. And unlike the Indiana laws, which allow photographs of ballots for other purposes, the Ohio statutes only allow certain persons in need of voting assistance to show their ballots to those who can help. *See* Ohio Rev. Code §§ 3599.20; 3505.24 (referencing assisting elector in marking ballot or form because of blindness, disability, or illiteracy).

And contrary to both cases, Defendants' evidence not only demonstrates Ohio's historic concerns¸ but also details the modern prevalence of attempted voter fraud, intimidation, and other such problems. (R. 24-3 at 237-40, 243-50). For example, the State's expert, Dr. Adler clarifies: "employer-induced political activity is relatively common in contemporary America." (*Id.* at 244). Employees are more likely to accede to pressure when they think their employer might monitor their beliefs and activities. (*Id.* at 245). Further, employers concede to using social media to "screen out candidates" and can do so based simply on political posts. (*Id.* at 249). This evidence supports the State's compelling interest "in preventing these evils." *See Silberberg v. Bd. of Elections*, 272 F. Supp.3d at 471 (citing *Burson*, 504 U.S. at 208).

In addition to what has been outlined, courts in Ohio have addressed a plethora of relevant legal challenges and voting issues. These range from election fraud;[14] to disqualification of job applicants or job termination due to political views;[15] to such information falling into the hands of a

---

[14]  *See e.g.*, *State v. Saunders*, 2024-Ohio-4580, *appeal not allowed*¸ 2025-Ohio-231 (Ohio Ct. App. Sept. 19, 2024) (affirming conviction in Cuyahoga County for election fraud).

[15]  *See e.g.*, *Gaines v. Cross,* 771 F. Supp.3d 982, 992 (S.D. Ohio 2025) (recognizing First Amendment does not prohibit discharge of employees by private employers or discharge of policymaking employees by public employer based on voter preferences).

political renegade, who seeks to harm others, whose beliefs do not align.[16] To that end, even an eighteen year old, innocently posting a completed ballot to reflect pride in his or her first trip to the polls, is a target for potentially ill motive and exploitation. The Ohio laws, which Plaintiff challenges as prohibiting "ballot selfies," consequently protect Ohio's voters from apparent harms and those they may not even contemplate.

And as asserted by the *Crookston* Court and the State's expert witness, the ban on ballot selfies also serves to protect the secrecy and privacy of other voters, who may not desire their picture to be posted on Facebook, Instagram, Snapchat, TikTok, or X. The snap of a camera or push of a video button, particularly with zoom capabilities, could- whether or not intentionally - capture other voters in the process of voting. Those cherishing voting privacy may not appreciate such intrusion. Similarly, the laws help protect precinct officials and volunteer poll workers, who perform a number sensitive polling tasks.[17] If unwittingly captured in ballot selfie photos (or videos), precinct integrity could be compromised, or worse, their safety could fall at risk.

Though perhaps not so intended in 1930, the modern effects of such laws serve a greater good than the outcome Plaintiff seeks – to advertise her selection of candidates and issues and entice others to vote the same as she – through ballot selfies. Given the substantial historical and present day harms, the State's interests outweigh the First Amendment right Plaintiff desires to

---

[16]  *See e.g.*, https://www.justice.gov/usao-dc/pr/ohio-man-sentenced-prison-assaulting-law-enforcement-trump-billboard-and-other-offenses; Stuart, Allyson Haynes, Social Media, Manipulation, and Violence, 15 S.C. Journal of Int'l Law & Bus. (2019); https://www.whitehouse.gov/presidential-actions/2025/09/countering-domestic-terrorism-and-organized-political-violence/.

[17]  For example, precinct officials and poll workers confirm identities by reviewing personal forms of identification, asking voters to orally confirm addresses; provide ballots; escort voters to machines; assist disabled voters; periodically conduct vote reconciliations; post voter rosters; answer questions; direct lost voters; and may even have to address combative persons. *See* poll-worker-training-manual.pdf

express. In balancing Plaintiff's speech interests, nothing prevents Plaintiff from posting on any or all of her favorite social media sites, for whom or how she voted. That is certainly Plaintiff's First Amendment right without governmental interference. What the laws protect is the integrity of the election process itself and the privacy interests of not only the selfie-taking voter, but of other voters and the poll workers who work to ensure election integrity.

Finally, Plaintiff argues that even if the government's interests are compelling, the statutes are not narrowly tailored because Ohio has laws specifically prohibiting vote buying and voter coercion, which are lesser restrictive means that sufficiently protect the government's interests. (R. 27, PageID 534-36) (citing Ohio Rev. Code §§ 3599.01(A)(1)–(3) (bribery); 3599.02(D)-(E) (bribery); 3599.05; 3599.06 (employer interference)). Plaintiff also asserts the laws are also overbroad, capturing those with benign intentions. (*Id.* at 538). The State counters, arguing the additional laws prohibiting vote buying and intimidation cannot – alone – adequately advance and protect the government's interests. (R. 30, PageID 582-83; R. 24, PageID 126).

Under intermediate scrutiny, tailoring does not require that the restriction at issue be "the least restrictive or intrusive means of serving the government's interests." *McCullen v. Coakley*, 573 U.S. 464, 486 (2014) (quoting *Ward*, 491 U.S. at 798). Rather, the means chosen must not "burden substantially more speech than is necessary to further the government's legitimate interests." *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 662 (1994) (quoting *Ward* at 799). The challenged portions of § 3501.35(A)(4) and § 3599.20 prohibit only the exhibition or display of a ballot the voter intends to cast. That "exhibition or display" is the most reliable means of vote confirmation, an essential component of vote-buying and voter-intimidation schemes. In addition, the statutes at issue are directed at the electors themselves. They dovetail with the other laws Plaintiff cites, which are primarily directed at conduct of others *towards* electors.

24

As the current laws provide both historically and modern protections to Ohio's voters, the Court finds the laws serve substantially important, and arguably compelling, State interests. And because the statutes are narrowly tailored to serve those governmental interests, the statutes satisfy First Amendment scrutiny. *Ariz. Free Enter. Club's Freedom Club PAC*, 564 U.S. at 734.

### D.  Immunity

The County Defendants also argue they are immune from suit under the Eleventh Amendment. (R. 26, PageID 329-31). *See Alden v. Maine*, 527 U.S. 706, 713-15 (1999). Sovereign immunity protects states and governmental entities that act as arms of states from suit. *S.J. v. Hamilton County, Ohio*, 374 F.3d 416, 419-20 (6th Cir. 2004). Plaintiff contends the BOE is not entitled to immunity because it has not established that it is an arm of the state. (R. 33, PageID 622-25). However, case law confirms it is. *See e.g., Beiersdorfer v. LaRose*, 397 F. Supp.3d 1037, 1053 (N.D. Ohio 2019) (Pearson, J), *aff'd*, No. 20-3557, 2021 WL 3702211 (6th Cir. 2021); *Hunter v. Hamilton Cnty. Bd. of Elections,* 850 F. Supp.2d 795 (S.D. Ohio 2012). Therefore, in addition to the Court's rulings on the merits, the BOE is also entitled to dismissal as it has Eleventh Amendment sovereign immunity from suit.

In addition, a county prosecutor is entitled to Eleventh Amendment immunity "*when prosecuting* state criminal charges" or "*enforcing* state law or policy." *Andrews v. City of Cleveland*, No. 1:22-cv-2050, 2023 WL 2607081, at *6 (N.D. Ohio Mar. 23, 2023) (Gwin, J.) (emphasis added); s*ee also Bojicic v. DeWine*, 569 F. Supp.3d 669, 691 (N.D. Ohio 2021) (Carr, J.), *aff'd*, No. 21-4123, 2022 WL 3585636 (6th Cir. Aug. 22, 2022); *Child's Healthcare Is a Legal Duty, Inc. v. Deters*, 92 F.3d 1412, 1414-15 (6th Cir. 1996) (The *Ex Parte Young* exception "does not apply when a state official has neither enforced, nor threatened to enforce, the allegedly unconstitutional state statute."). Here neither has occurred, so Defendant O'Malley raises a novel

question: whether a county prosecutor, who is responsible for – but has not yet enforced – state law is entitled to immunity. The Court, operating under the canon of constitutional avoidance, declines to answer this, having set forth other grounds for dismissal.

### E.  Plaintiff's Daubert Challenge to Defendant's Expert

In her Opposition, Plaintiff contests the Court's ability to consider the report of Dr. Adler, the State's expert, arguing that it is not admissible and does not satisfy the *Daubert* factors. (R. 33, PageID 634-43). This bears mentioning because the Court treats the challenge as a motion to exclude. *Neal v. Divya Jyoti Ltd.*, No. 2:18-cv-958, 2019 WL 3416255, at *7 n.8 (S.D. Ohio July 29, 2019). Plaintiff contends the report reflects Dr. Adler's personal opinions; relies on anecdotal evidence; is not supported by "legitimate methodology;" has not been peer reviewed; and fails to consider other potential causes or remedies. (*Id.*). Defendants counter that non-scientific expert testimony need not satisfy the *Daubert* factors to be reliable, but even if it did, Dr. Adler's report is sufficiently so. (R. 34, PageID 970-75; R. 35, PageID 985).

Federal Rule of Evidence 702 governs admissibility of expert testimony. And under this rule, experts are qualified by "knowledge, skill, experience, training, or education." The Court's task is to determine whether Dr. Adler's report is sufficiently reliable and relevant. *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529-30 (6th Cir. 2008). In making such determinations, courts consider a non-exhaustive list, known as the *Daubert* factors, which include testing, peer review, publication, known or potential error rates, and "general acceptance within a relevant scientific community." *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 429 (6th Cir. 2007) (quoting *Daubert*, 509 U.S. at 592-94). But the *Daubert* factors are not a checklist, and the reliability inquiry can depend on "the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Daubert*, 509 U.S. at 593; *see also First Tenn. Bank Nat'l Ass'n v. Barreto*, 268 F.3d

319, 335 (6th Cir. 2001).

Dr. Adler draws from a range of historical sources and contemporary research related to election privacy and integrity, which is sufficiently more than anecdotal evidence. (R. 24-3; R. 33-1, PageID 711-15, 757). *See Saginaw Chippewa Indian Tribe of Mich. v. Granholm*, 690 F. Supp.2d 622, 636–37 (E.D. Mich. 2010). The Court finds his methodology is an accepted approach in the field of political science, which reliably supports his opinions. *See Jackson v. E-Z-GO Div. of Textron, Inc.*, 326 F. Supp.3d 375, 444 (W.D. Ky. 2018).[18]

For these reasons, the Court does not discount or exclude Dr. Adler's expert report.

## V.     CONCLUSION

As the Sixth Circuit in *Crookston v. Johnston* stated:

A picture may be worth a thousand words, but social media users can (and do) post thousands of words about whom they vote for and why. Although the loss of any potential First Amendment freedom deserves serious consideration, the government's interests…outweigh any imposition on the expressive rights of Crookston and other would-be selfie-takers – particularly given the privacy interests of *other* voters in not having *their* votes made public.

841 F.3d at 400.

The Court does not ignore the Sixth Circuit's intimation on remand of this case that because Ohio's statutes impose penal consequences upon violators, these laws *could* violate the First Amendment. Finding Plaintiff established a threat of imminent harm, the Circuit stated:

…[W]e are mindful that a lack of discipline ... could just as well indicate that speech has already been chilled…. That point applies with particular force to the laws Kareem challenges, which punish the display of a marked ballot with up to twelve months' imprisonment…. Yet that modest trade may be driving Kareem and others to forego constitutionally protected expression....

---

[18]     In so finding, the Court rejects Plaintiff's argument that the report is unreliable because it is based on personal opinions. (R. 33 at 641-43) (citing R. 33-1 at 757). *Ohio Org. Collaborative*, 2016 WL 8201848, at *2-3. Also, the Court rejects the premise that the report is unreliable because Dr. Adler did not consider the effect of other criminal laws prohibiting vote buying and selling. As Defendants note, he did. (R. 24-3 at 247-51; R. 33-1 at 640-41, 736-38).

*Kareem v. Cuyahoga Cnty. Bd. of Elections*, 95 F.4th 1019, 1026 (6th Cir. 2024) (citing *Speech First, Inc. v. Schlissel,* 939 F.3d 756, 766 (6th Cir. 2019); *Majors v. Abell*, 317 F.3d 719, 721 (7th Cir. 2003) (noting "a criminal statute challenged under the First Amendment may have a particularly latent threat of enforcement 'when the gains are slight' since 'most people are frightened' of the punitive costs.")). But the appellate court specifically reserved judgment on the merits, finding "[w]hether the display of a ballot photograph is protected by the First Amendment will be for the district court to decide." *Id.* at 1027.

For the reasons set forth herein, the Court finds Ohio's laws encompassing ballot selfies are sufficiently tailored to further important State interests. which justifies the claimed infringement on speech rights.

As a final note, to boost her position Plaintiff argues a number of states have repealed or modified their laws to reflect modern trends. (R. 27, PageID 522). And, as noted in the Complaint, the Ohio General Assembly has, at least twice, attempted to amend or repeal these laws. (R. 1, PageID 5-6). The attempts in 2016 and 2018 failed. (*Id.*) (citing 131st Ohio General Assembly H.B. 609; 132nd Ohio General Assembly H.B. 759). It is the specific task of this Court to determine if Ohio's laws, whether independently or conjunctively, impermissibly violate the First Amendment rights of not only Plaintiff, but all Ohioans. Finding they do not, the task of amending, modifying, or even repealing these laws remains with the Ohio General Assembly, which has previously declined to do so.

Consequently, for the foregoing reasons, Plaintiff's Motion for Summary Judgment (R. 27) is DENIED. Defendant Secretary of State's Motion for Summary Judgment (R. 24) is GRANTED; and the County Defendants' Motion for Summary Judgment (R. 26) is GRANTED.

This action is therefore DISMISSED.

IT IS SO ORDERED.


Date: June 3, 2026

s/ *David A. Ruiz*
David A. Ruiz
United States District Judge